## Staunton.

### NELSON'S ADM'R, &C., v. KOWNSLAR'S EX'OR & ALS.

#### October 6, 1884.

1. DOWER—*Provision in Lieu.*—Under Code 1860, chapter 110, sections 4 and 5, in order that provision for wife in will of husband shall be held to be in lieu of dower, the will must so declare in terms, or the conclusion from the provisions of the will must be as clear and satisfactory to that effect as if it was so expressed. *Secus*, under Code 1873, chapter 106, section 4.

2. IDEM—*Idem—Election.*—Under Code 1860, no question of election between dower and provision in lieu thereof arises, unless the intention to bar dower is clear. Under Code 1873, unless the intention plainly appears *not* to bar dower, the election must be made by the widow between the dower and the provision, as prescribed by section 5 of chapter 106.

3. DISTRIBUTIVE SHARE—*Provision by Will—Election.*—But under Code 1860, chapter 123, section 12, and likewise under Code 1873, chapter 119, section 12, when *any* provision for a wife is made in her husband's will, she may, *within one year* from the admission of the will to probate, renounce such provision, and take such share of his personal estate as she would have had if he had died intestate.

4. CHANCERY PRACTICE—*Commissioners—Accounts.*—Under decree, a master settles accounts and reports a balance as due executrix, and the report is confirmed. Later, another master is ordered to take an account of further receipts and disbursements. It is proper he should make that balance the basis of his settlement.

5. IDEM—*Idem—Reference.*—Where a cause is referred for ascertainment of certain matters by enquiry and proof, it is improper for the chancellor, before such enquiry has been made and proof taken, to forecast the master's report and make him a mere copyist thereof.

6. IDEM—*Decrees—How Disturbed.*—When a decree has been once entered and the term ended, that decree can be disturbed only by petition to

rehear, bill of review, bill to impeach, or by appeal. *Wooding's Ex'x* v. *Bradley's Ex'or & als.*, 76 Va. 614, considered and explained.

7. LACHES—*Case at Bar.*—Record discloses circumstances under which it is held improper to rehear a decree confirming a settlement of executorial accounts, after the lapse of thirteen years, the death of the principal parties, the master's removal west, and the loss of all the vouchers, proofs and evidences.

Appeal of Hugh M. Nelson, as administrator of Mrs. Anna M. A. Nelson, deceased, and in his own right, from decrees of circuit court of Clarke county, entered 29th May, 1878, 1st June, 1881, and 6th February, 1883, in the chancery cause of A. M. A. Nelson, executrix of Hugh M. Nelson, deceased, against Randolph Kownslar's executor, William F. Turner's administrator and als.

Hugh M. Nelson, senior, died in 1862, leaving a will, a widow, Anna M. A. Nelson, two children, Nancy D. Nelson and Hugh M. Nelson, a tract of land called "Long Branch," and personalty, which was sold for $5,878.21. His will was dated 15th July, 1862, and probated 27th August, 1866, in the county court of Clarke county, and his widow qualified as his executrix. The will, reciting that all the testator's property came by his wife, gave her the entire residuum, after paying his debts. It desired her to sell his estate and pay his debts. He was indebted to an extent greater than the value of his estate, though she knew it not for some time afterwards. Among his debts was one of $10,000, principal part due to Douglas H. Gordon, and secured by trust deed on "Long Branch."

She had a separate estate of her own invested in Massachusetts. Out of this, mostly in 1866, 1867 and 1868, and the personalty, she paid a large portion of the Gordon debt and other debts, in whole or in part, of the testator. In March, 1867, through her counsel, Robert Y. Conrad (retained as the will advised), she filed her bill as executrix, and in her own right, in said circuit court against her two children, Gordon and his trustee, praying that the debts (including her own) against

the estate be audited, the assets applied to their payment, the settlement of her administration, the convening of the creditors, the sale of "Long Branch," &c.

In May, 1867, the circuit court decreed that Edward White, master commissioner, "inquire into, ascertain, settle and state the several· matters referred to in the bill, and ascertain and settle particularly: 1st. The amount and value of the testator's personal estate. 2d. The amount and character of the debts due from the estate, distinguishing such as are specific liens. 3d. His real estate, any specific liens thereon, and what payments, by whom, and out of what funds, have been made since his death. 4th. What payments of his debts the executrix has made and out of what funds. 5th. The value and rental of the real estate, and whether the debts unpaid, including those paid by the executrix out of her own funds, could be discharged out of the rents and profits in a reasonable time; and lastly, the executorial accounts so far as administered." The master was also directed to convene the creditors, take proof of their claims, state the same and their character, &c., and ascertain and report whether the real estate will sell most advantageously as a whole or in parcels. Commissioner White executed this decree, and returned his report 11th April, 1868. He debited the executrix with the gross amount of the sales of the personalty, and after crediting her with commissions, charges of administration and debts paid by her, there was a balance due her of $11,162.88, principal and interest, as of 12th May, 1868. This balance added to other debts proved aggregated $36,367.85. Among the debts proved, was the debt of Randolph Kownslar, and the debt of W. F. Turner, and the debt of C. L. Brent, the latter being later shown to have been paid. Having thus proved their debts, these creditors became parties to the suit. On 16th May, 1868, the circuit court decreed that the said "report be approved and confirmed, no exception having been made thereto," &c. The decree also directed the sale of "Long Branch" in parcels, by Robert Y. Conrad, special commissioner. He sold $280\frac{1}{4}$ acres

to Mrs. Nelson at $100 per acre, aggregate $28,025. The sale was confirmed 18th October, 1869. The other parcel was sold in October, 1875, to Hugh M. Nelson, at $5,775, and the sale was confirmed.

In February, 1874, Mrs. Nelson presented her petition, representing that she had been ignorant of the financial condition of her husband's estate, and unable to form an idea of the comparative value of his legacy and of her dower interests, praying for an account thereof, saying she had paid more than half of the purchase money of the land she had bought; that she was a large creditor of the estate ; that since his death she had occupied the mansion and curtilage, and that his son had occupied the farm, and asked that dower, or its commuted value, be assigned her. Upon this the circuit court ordered an account to be taken according to her prayer. Commissioner Louthan took the account, and returned his report 23d May, 1874. He ascertains the present value of the dower interest in *all* the realty to be $10,552.99, and reports in favor of the widow's right of election. He states her executorial accounts. He starts with a credit to the executrix of balance due her, as per Commissioner White's report (made in 1868), $11,162.88, and after adding interest since 1868, credits her with other payments not included in that settlement, making balance in her favor $21,790.44, as of 1st May, 1874. Claims of other creditors, to the amount of $3,780.05, were also allowed. To this report the creditors filed four exceptions :

"1. Because dower is allowed widow (this included the question of her right of election). 2. Because she is credited by whole of debts paid by her, many being payments in full, thus defeating the right of other creditors, who have not received anything, to a distribution *pro rata* with those paid. 3. Because commutation of dower is allowed without consent of all parties. 4. Because the amount so allowed is too large."

In March, 1875, the third exception being withdrawn, the others were overruled. The decree recites that " commutation

of dower is now, *by consent of all parties,* allowed to so much of the land as has been sold, provided that such consent precludes not any appeal which the creditors may take from so much of the decree as overrules the first exception and allows the widow now to elect dower." Commissioner Louthan ascertained $6,145.73 to be the present value of dower in the land sold, which the court allowed to be credited on her purchase, with interest from 12th October, 1869; and the report of said commissioner was in all respects approved and confirmed. No further complaint was made for three years. Robert Y. Conrad died in 1875, Mrs. Nelson in 1876. Commissioner White removed to St. Louis in 1871. The vouchers, proofs, and evidences whereon he founded his report were lost.

Under these circumstances, in May, 1878, C. Lewis Brent, and the personal representatives of Randolph Kownslar, and of W. F. Turner, as creditors of the testator, petitioned for a rehearing, review and reversal of the decree of March, 1875, and of all subsequent decrees. The errors set forth are the same alleged in the exceptions to Louthan's report of May, 1874, which were overruled in March, 1875.

The petition seeks the rehearing only on the ground of "errors apparent in the record." In May, 1878, the court granted the rehearing solely on the second assignment, to wit: the allowance to Mrs. Nelson of credit as executrix for the *full* amount of debts paid by her, instead of for only a *ratable part* thereof with the other creditors, the assets being insufficient to pay all in full. The commissioner was directed to revise the reports theretofore made, to the extent of ascertaining by proper proof which of the debts paid by the executrix were entitled to preference, and the ratable share applicable to the petitioner's claims.

The rehearing was granted on the theory of the court, that while it *does appear* from the papers in the cause that certain of the debts paid by the executrix, constituted liens on the testator's lands, it *does not appear* that other debts paid by her

were entitled to preference, and that the assets have been applied ratably to the debts.    This theory is set forth in the decree.

Commissioner Louthan executed this decree, and returned his report 6th May, 1880.    The cause was again heard January 1st, 1881, when the court again ordered the rehearing ordered by decree of May, 1878, recommitted the cause to a commissioner, and directed him to restate and settle the executorial accounts upon the principles indicated in a paper in the handwriting of the judge, marked X, which is a full statement and settlement of those accounts in detail, debits and credits from the commencement, without regard to any settlements theretofore made. It is based on the *assumption* of errors, involving matters of fact *before inquiry*, and is intended as a guide and direction to the commissioner.  It fills ten pages of the record.    Title to the land she had bought was conveyed to Mrs. Nelson's heirs under decree of November 11th, 1876, on the supposition that when credited by the commuted value of her dower and the payments she had made, the purchase money had been overpaid. But according to statement X her estate was still indebted, after deducting all credits, to the amount of $12,530.48, with interest from 1st January, 1876.  Her representative petitioned for a rehearing of the decrees of January 1st, 1881, and May 27th, 1878, for errors therein ; but the court by decree of February 6th, 1883, denied the prayer.    An appeal was allowed him from these three decrees.

*Holmes Conrad, Burks & Burks,* for the appellant.

*S. J. C. Moore,* for the appellees.

RICHARDSON, J., delivered the opinion of the court:

In this complicated case but two questions arise, which will be considered in their order.

I. Is Mrs. Nelson entitled, under the circumstances, to dower

in the real estate of which her husband, H. M. Nelson, died seized, known as "Long Branch." This question first arose some years after Mrs. Nelson administered upon the estate of her testator, when, in response to an inquiry directed upon her petition in the cause, the commissioner reported that she was entitled to dower and ascertained its commuted value, she having signified a willingness to accept the commuted value.

The will in this case was made July 15th, 1860, and must be construed and take effect according to the law then in force. §22, ch. 118, Code 1873, also see §22, ch. 122, Code 1860.

The law then in force and applicable to the question we are now considering, is found mainly in sections 4 and 5 of ch. 110, Code 1860. The only other provision necessary to be referred to in this connection is §12, ch. 123, Code 1860. Said section 4 of chapter 110, Code 1860 reads: "If any estate, real or personal, intended to be in lieu of her dower shall be conveyed or devised for the jointure of the wife such conveyance or devise shall bar her dower of the real estate or the residue thereof."

Said section 5, chapter 110, Code 1860, reads: "But if such conveyance or devise were before the marriage, without the assent, or during the infancy of the *feme*, or if it were after marriage—in either case the widow may, at her election, waive such jointure and demand her dower. And when she shall demand and receive her dower the estate so conveyed or devised to her shall cease and determine.".

By an act of the general assembly passed on the 21st day of February, 1866, said sections 4 and 5 were very materially altered and the policy of the law to that extent changed. See Acts 1865-6, ch. 49, which sections, as amended, now appear in sections 4 and 5 of ch. 106, Code 1873. These amendments, it is obvious, have no influence nor anything to do with the question under consideration. Looking, then, to these plain statutory provisions, which were in force when the testator's will was made and by which effect must be given to that instrument, it is matter of surprise that any one could for a moment question

Mrs. Nelson's right to dower under all the circumstances in the land of which her husband died seized.

There certainly is not in the will a single expression intimating, in even the slightest degree, an intention on the part of the testator that the provision in his will for his wife was made and intended to be in lieu of her dower. In fact, the language of the will necessarily repels the idea that there was any such testamentary intention. The last utterance of the testator on the subject is, "*and if any portion is left after paying all my just debts, I give and bequeath it to my dearest wife and her heirs forever,*" &c.

In the construction of wills the pivotal point always is the testator's intention, and that to be derived from the will itself. Hence, the legislature, keeping this cardinal principle in view in framing said section 4 of ch. 110, Code 1860, employed the language, "*intended* to be in lieu of her dower," &c. So far as concerns the wife's right to dower in the real estate of which her husband was, at any time during coverture, seized, no duty of election is imposed (under the law then in force) by a provision in her husband's will for her benefit, unless it be plainly expressed in the will that such provision is intended to be in lieu of her dower; nor is it allowable to infer such an intent on the testator's part from other parts of the will by conjecture or probability; there must be (when not so expressed), something from which the clear and necessary implication arises, and this must be as clear and satisfactory as if it were expressed; otherwise no duty of election is imposed. *Higginbotham* v. *Cornwell*, 8 Gratt. 83. This contention is attributable solely to a confusion of the widow's right of dower proper, with her right to her distributive share in the personal estate of her deceased husband. A widow's dower and her distributive share are very different things. Dower is a widow's life estate in land; a widow's distributive share is (as the law was), a third part of the slaves for life, and of the other personal estate absolutely. The statutes regulating these different subjects, call them by different names,

and prescribe different rules and incidents about them. Samuels, J., in *Findley's Ex'ors* v. *Findley,* 11 Gratt. 434.

By the law in force, when the will in question was made, the widow, when there was a conveyance or devise *intended* to be in lieu of her dower, simply had the right of election without restriction as to time. This last clause of said § 5, ch. 110, Code 1860, being in these words : " And when she shall *demand* and receive her dower, the estate so conveyed or devised to her shall cease and determine." By the amendment to this section, before referred to, the language is very different—it is, " And when she shall *elect* and reserve her dower," &c., &c. This material change of phraseology was rendered necessary in order to conform to the preceding part of said amendment requiring such election to be made within one year after the death of the husband, or within one year after the admission of his will to probate, when the provision is by will, &c. The necessity for the phraseology employed in this amendment is made more obvious when we look to the amendment of the preceding fourth section by which this provision was added thereto : " And every such provision, by deed or will, shall be taken to be intended in lieu of dower, unless the contrary intention plainly appear in such deed or will, or in some other writing signed by the party making the provision."

Thus the policy of the law was reversed, and instead of the expressed intention or clear and necessary implication essential to put a widow to her election in respect to dower in her husband's real estate, every such provision for her was declared to have the effect of being in lieu of dower unless the contrary intention should plainly appear.

Now, as to the widow's distributive share of the personal estate, it is only necessary to say that Mrs. Nelson is, as to that, and only as to it, affected by the provision in her husband's will, that *she* should have what might be left after the payment of his debts.

By the twelfth section of our chapter on descents and dis-

tributions, chapter 119, Code 1873 (which is identical with § 12, chapter 123, Code 1860), it is provided: "When any provision for a wife is made in her husband's will, she may, within one year from the time of the admission of the will to probate, renounce such provision. * * * * * * If such renunciation be made, or if no provision be made for her in the will, she shall have such share of her husband's *personal estate* as she would have had if he had died intestate, otherwise she shall have no more *thereof* than is given her by the will." This provision has reference solely (as the law was) to the wife's distributive share in the personal estate, and as the law was when this will was made, has no reference to or bearing upon the wife's dower in the real estate, except when, as the law was, such provision clearly appears to have been intended in lieu of dower. By this provision (as the law was), whether the provision for her in this will was much or little, she could accept it independent of and beyond her dower in the real estate, or at her election renounce the provision made in the will, and take absolutely her distributive share of the personal estate, and in neither event affect her right of dower in the real estate. In other words, in such case, if she renounced the provision made, or if no provision was made, she was thereby placed in precisely the attitude she would have been in had the husband died intestate as to his personal estate. This is illustrated by many decided cases.

*Higginbotham* v. *Cornwell, supra,* was a case in many respects strikingly like this. In that case, the husband, during coverture, sold and conveyed land with general warranty, but his wife did not join in the conveyance. By his will he gave his whole estate, real and personal, to his wife for her life, remainder to his children. She was held entitled to take under the will, and also to have her dower in the land sold. It was also held in that case, that in order that a provision for a wife in the will of her husband should be held to be in lieu of her dower, the will must so declare in terms; or the conclusion from the pro-

visions of the will ought to be as clear and satisfactory as if it was expressed. In that case, like this, it was insisted that the widow was barred of her dower by the provision made for her in the will, which was intended by the testator to be in lieu of dower, which provision it was averred she had accepted. Then, too, the will of the testator, the acceptance of the widow thereunder, and the deed of the husband, made upwards of thirty years prior to the date of the will, were relied on to defeat the widow's claim to dower, but the defence was unavailing. Referring to the facts, Baldwin, J., delivering the unanimous opinion of the court, said: "And the question presented by the record is, whether the widow is entitled to recover the dower claimed and also to retain the provision made for her by the will? If she is, then her acceptance or refusal of that provision is a matter wholly immaterial." It was held that she was so entitled; the same learned judge proceeding says: "The dower provided by law in behalf of a widow by which is secured to her one-third of all the lands of her husband of which he was at any time seized during the coverture is paramount to all conveyances, encumbrances, contracts, debts or liabilities of the husband. But as there is no obligation upon him to make a greater provision for her than that which is conferred by law, it is competent for him, in the exercise of his testamentary power in her behalf, to couple it with the condition that it shall be a substitute for and stand in lieu of her legal dower in the whole or any part of his estate, and thus propose to become the purchaser of the latter, and then if she accepts the devise she takes it with the condition thereto attached, or if she rejects the condition she thereby rejects the devise itself, and so she cannot have both the legal dower and the devise which she accepts as its substitute. And the devise in her faver may be thus made conditional by its express terms or by a clear and necessary implication of the testator's intent to that effect to be derived from the will. But as the exercise of a testator's testamentary bounty in behalf of his wife beyond or irrespective of the provision made for her

by law, is natural and frequent, it is not allowable to infer an intent on his part to the contrary from other parts of the will by conjecture or probability."

The legal meaning of the distinguished judge applies with peculiar force and exactness to the case in hand. Here there is no condition coupled with the devise to Mrs. Nelson, no allusion to any fact or circumstance by the testator from which there could arise a necessary implication of intent to devise in lieu of dower, nor even an intimation of anything of the kind.

To the same end, it is only necessary to refer very briefly to some other authorities.

In *Findley's Ex'ors* v. *Findley, supra,* there was an agreement in contemplation of marriage. The intended husband bound his estate to pay to the intended wife certain sums of money, if she survived him, which were to be in bar of and in full compensation for her dower. It was held: "This agreement barred her of her dower in her husband's real estate, but did not deprive her of her distributive share of his personal estate." So here, Mrs. Nelson having generously forborne to renounce the provision for her, simply loses her distributive share of the personal estate, all of which has gone to the creditors, and that act of simple generosity on her part can, by no possibility, be tortured into a relinquishment or bar of her legal dower in her husband's real estate.

*McReynolds* v. *Counts*, 9 Gratt. 242, is to the same effect. In *Blunt & al.* v. *Gee & al.* it was held: "If the widow does not renounce her husband's will within one year after his death, she loses her distributive share of the personal estate, and is confined to the provision of the will, but is entitled to her dower in the lands." Many other authorities might be cited to the same effect, but it is deemed unnecessary.

In the face of all these authorities, it is contended on behalf of the appellees that Mrs. Nelson by her bill dedicated the entire tract of land to the payment of her husband's debts; that she even pledged her own separate estate for any deficiency,

and afterwards became the purchaser of a portion of the land, and paid a large part of the purchase money, and then filed her petition claiming dower, and that these facts and circumstances bar her claim to dower. There is nothing in the will of the testator, nothing in either the bill or petition filed by Mrs. Nelson, or in the law bearing on the case to warrant any such conclusion. On the contrary, her bill shows that she had largely involved her own separate estate in the payment of her husband's debts, was in the dark in respect to her own rights, and asked that the trust might be administered by the court, and her interests protected. In her petition for dower, and for leave to make proof of further payments by her, she simply shows that under the guidance of the court enough light had been shed upon the situation to enable her, with some degree of intelligence, to protect her interests. Yet the appellees, standing in this court on this question as parties on cross-appeal, insist that these circumstances are equivalent to a solemn and formal renunciation of her right of dower by Mrs. Nelson. By reason of the principles above stated, the contention on the part of the appellees in this respect must fall to the ground, and Mrs. Nelson's right to dower, as decreed by the court below, must be upheld.

II. It only remains to consider the errors assigned by the appellant (1) in respect to the rehearing granted by the decree of May 29th, 1878, involving not only a ripping-up and restatement and settlement of the account of Commissioner Louthan of May 21st, 1874, confirmed March 2d, 1875, but going back of that and overhauling, restating and settling the accounts reported by Commissioner White in April, 1868, in obedience to a decree, and, which, without any exception thereto, was confirmed by the decree entered May 15th, 1868; (2) the errors assigned in respect of the decree of June 1st, 1881, in following up the line marked out by the decree of May 29th, 1878, and by going further and first deciding that there are errors apparent on the face of the commissioner's *reports theretofore* made in this cause,

directing the said report of Commissioner White to be over-hauled and restated upon principles indicated in paper "X," prepared by the court, which paper "X" is an elaborate statement of all the transactions and matters of account from the beginning of the suit, bringing Mrs. Nelson largely in debt, when by the settlements theretofore made and confirmed she was justly a creditor of the estate for a very large amount; and (3) after so deciding and stating the account as the result of the decision, in referring the matter to a commissioner for proof to sustain the result already arrived at by the court in the absence of evidence; and (4) in respect to the alleged error in the decree of February 6th, 1883, in refusing the petition of the appellant for a rehearing of said decrees of June 1st, 1881, and May 29th, 1878.

These decrees will now be examined in the order in which they were rendered. The decree of May 29th, 1878, presents an anomaly in practice. Under the first decree rendered in the cause (May 16th, 1867), Commissioner White, in strict obedience thereto, stated, settled and reported the accounts directed, showing due Mrs. Nelson, as executrix of her husband, H. M. Nelson, deceased, for debts of the estate paid by her out of her own separate estate, the sum of $11,162.88. This account was taken after protracted publication as required by the decree, and the two creditors, whose personal representatives (the appellees) now assail that report, appeared and proved their debts. No objection was made before the commissioner to the amount reported in favor of Mrs. Nelson. The commissioner returned his report; and the cause having been regularly matured came on to hearing on the 15th day of May, 1868, and there being no exception thereto by any one, and, in the language of the decree then entered, was *explained by counsel*, the said report was approved and confirmed, and by the same decree, in response to the bill, special commissioner, R. Y. Conrad, was directed to make sale, public or private, as to him might seem best, of the land (Long Branch) in such portions as he might deem *best for the interests*

of the widow and children.  In his report aforesaid Commissioner White had fixed the value of "Long Branch" at $87.50 per acre.  In October, 1869, at a sale made by special commissioner, Conrad, Mrs. Nelson became the purchaser of 280¼ acres of said tract, including the mansion house and out-buildings, at $100 per acre, her purchase amounting to $28,025.  This sale was reported and confirmed to her, and she paid a large portion of the money and by subsequent proceedings decrees were entered directing disbursements.  Various efforts were made, but a sale of the residue of the land was not for some years effected from the fact, doubtless, of the then great depreciation of values and the unimproved condition of that portion of the land.

Being then in a condition to better understand the situation and protect her rights both as doweress and as a large creditor of the estate she, in February, 1874, filed her petition claiming her dower, expressing her willingness, however, to accept its commuted value if best for the interests of the creditors, and alleging that, in addition to what had been allowed her by Commissioner White, she had paid other large sums or debts due from the estate and asking leave to make proof thereof.

On the 26th of February, 1874, a decree was entered in the cause directing the inquiry prayed for, and the decree recites that, it being suggested that upon certain of the debts paid by Mrs. Nelson as executrix, interest had been improperly paid for the period of the war, the commissioner was directed to inquire into and report as to that matter also.  The decree was executed by Commissioner Louthan, who, on the 21st day of May, 1874, reported (1) that the widow was entitled to dower; (2) that the widow's expectation of life was sixteen years, and the present value of each year, aggregating $10,562.99; and (3) that there was no evidence of interest improperly paid by her for the period of the war.  The commissioner (Louthan) also reported additional payments in favor of Mrs. Nelson, amounting to several thousand dollars, saying in reference thereto: "The

following are represented by vouchers not presented to Commissioner White, amongst which are also evidences of payments on debts heretofore reported."

Commissioner Louthan commenced, and properly so, to state his account upon the basis of the former confirmed report of Commissioner White. He first (keeping principal and interest separate) credits Mrs. Nelson with precisely the same items with which Commissioner White had credited her, making said sum of $11,162.88 the basis. Then bringing in said additional payments reported in her favor, ascertains the estate to be indebted to her, as of the first of May, 1874, in the sum of $15,816.68, or, aggregating them, principal and interest, the sum of $21,790.44. Other debts against the estate were also reported, but they need not be noticed here.

To this report several exceptions were taken, viz: 1st. Because Mrs. Nelson was, under the circumstances, allowed dower; 2d. Because she is allowed credit by the whole amount of debts of the estate paid by her, "*many* of them being payments in full, and thus defeating the right of other creditors, who have not received anything, to a distribution *pro rata* with those paid;" 3d. Because commutation of dower was allowed; and 4th. Because too large a sum was allowed as commutation.

The cause was again heard on the 2d of March, 1875, when the said third exception was withdrawn, and the 1st, 2d and 4th of the series were overruled by the decree then entered; and by consent of all parties commutation of dower was by said decree allowed as to so much of the land as had been sold in the suit and purchased by Mrs. Nelson, commissioners appointed to assign by metes and bounds to Mrs. Nelson dower in the land remaining unsold; and the court then, by its commissioner, ascertained the commuted value of the dower in the land purchased by her to be $6,145.73, and directed special commissioner R. Y. Conrad to credit Mrs. Nelson on her said land purchase with that sum, with interest from October 12th, 1869, the date of her purchase. Mrs. Nelson, and also her legal adviser and friend,

R. Y. Conrad, were then both living. Mrs. Nelson, however, died in 1876 and Mr. Conrad in 1875, and Commissioner White had long since removed from the state. After this decree, over-ruling this contention of the appellees (who are personal repre-sentatives and who raised these questions after the death of the creditors whose estates they represent), we hear nothing more of the matter until 1878, when these same representatives filed their petition to rehear said decree of March 2d, 1875, which overruled their said exceptions and confirmed said report of Commissioner Louthan. The grounds of the petition are the same as said exceptions. In the petition reference to the *reports* theretofore made in the cause is had in general terms, but there is not even mention made of the report of Commissioner White, confirmed over ten years before, nor of the decree confirming same; the prayer of the petition being to rehear only the said decree of March 2d, 1875.

On the same day on which the petition was filed (May 29th, 1878), a decree was rendered overruling the petition in other respects, but granting the rehearing as to the ground therein alleged, to-wit: "That Mrs. Nelson had been given credit as executrix for a very large amount of the debts of the testator paid by her in disregard of the requirement of law that all creditors of the same class shall be paid *pro rata.*" And the prayer of the petition is not to overhaul the report of Commis-sioner White, or to rehear and reverse the decree confirming it, but to rehear, review, and reverse the decree of March 2d, 1875, and all subsequent decrees based thereon. This ground of error (the only one here involved) is not in precisely the same language, but of similar import to the corresponding second exception to Commissioner Louthan's report. Whether we look to one or the other, or both, the meaning is the same, and amounts to this: while *some* of the debts were properly paid, "many" were improperly paid in full. There is no designation of any one or any number of debts that were either properly or improperly paid. It must be borne in mind, too, that there is

no pretence to any after discovered evidence ; the petition distinctly rests upon alleged errors apparent upon the face of the record.

It is evident that great labor and pains were bestowed upon their respective reports by both Commissioners White and Louthan.   The most rigid scrutiny fails to discover any error on the face of either report.

In its decree granting the rehearing the circuit court says: " The court is of opinion that it does appear from the papers of the cause that certain of the debts of the testator which have . been paid by the executrix, and for which credit has been allowed her to the full amount, did constitute liens on the lands of the testator, but it *not appearing* that other of the debts paid by her, and for which such credit has been allowed her, were . liens on said land or otherwise entitled to preference ; and it not appearing that the assets of the estate that came into her hands have been applied by her ratably to the debts ascertained to be due by the estate of the testator," &c., therefore the rehearing as aforesaid was granted and the cause referred with directions to the commissioner (1) to revise the *commissioners' reports* theretofore made in the cause " to the extent of ascertaining by proper proof" which of the debts of Hugh M. Nelson were properly entitled to preference, &c. ; (2) to ascertain the ratable share of the assets properly applicable to the claims of said petitioners, and (3) to ascertain any other matters deemed pertinent or required to be stated and reported by any party, and report the proofs to court.

It is thus apparent that the court in its decree went very far beyond the actual prayer of the petition and at least by necessary implication directed the overhauling and resettlement of accounts reported by Commissioner White and solemnly confirmed by decree more than ten years before.   This was wholly unauthorized by any rule of law or practice.   If it were permitted, the essential principle which imputes verity to public records would be overturned and no man's rights, depending

upon the sacredness of the records, would be secure, and incalculable mischief would be the result.

Commissioner White's report has never been excepted to by any one. When that report was confirmed in 1868, it was merged in—locked up—so to speak, in the decree of confirmation, and so became a verity of record, a fortress within itself, and must so stand until assailed and reduced by some legally prescribed method. Commissioner White's report is in no way dependent upon the subsequent report of Commissioner Louthan, but the reverse; for, of necessity, Commissioner Louthan, under the directions to him, and in pursuance of the well established rule, had to make the report of Commissioner White the basis of his report. It was perfectly legitimate to attack by petition to rehear, as was done, the decree of March 2d, 1875, confirming Commissioner Louthan's report—*i. e.*, as to matters reported by the latter, not dependent upon the former confirmed report of Commissioner White. But it was not legitimate, as was done, to attack, by the decree of 1878, the report of White, which, more than ten years before, had passed into decree, for it was then open to no such assault, nor can any such properly prevail. If at the proper time, and under proper circumstances, there had been a petition to rehear the decree of May, 1868, it would have been all right, upon proper cause shown to rehear. But the parties were all present when Commissioner White's report was made, and offered no objection—were also present in court, when it was, without exception, confirmed, and have for long years acquiesced in. In the meantime the parties having the most intimate knowledge of all these transactions have gone to the grave, and the vouchers and other evidences lost beyond the hope of recovery. It is too late now to rip up that settlement, especially upon the bare assumption of errors that do not appear. Both the petition asking it, and the decree granting the rehearing, proceed upon the idea that " many" of the debts paid by the executrix do not *appear* to have been properly paid. Not one is specified; not a single error is pointed

out. If the errors were apparent, they could, and should have been pointed out; and then if the proceeding had been regular and in good time, not blurred by staleness, the result of long acquiescence, there would have been little else necessary than a simple calculation, either by its commissioner, or the court itself, to correct and reform the decree. The very fact that the court by its decree expresses the opinion that as to "many" of the debts there *is error apparent,* and then refers the matter for proof, is such a contradiction in terms as at once to make it appear that the decree itself is erroneous and should be reversed.

In the printed notes of argument of one of the counsel for the appellant, reference is made, with seeming approbation, to a remark of Staples, J., in *Wooding, Ex'x* v. *Bradley,* 76 Va. 614, which is this: "There is no rule of law or practice which forbids a court, so long as it retains a cause under its consideration, from receiving and entertaining an exception to a commissioner's report, even after the same has been confirmed, *if it be clearly shown that the report, if carried out, would be productive of injustice and wrong.*"

The very broad qualification to the proposition (which I italicise) could not make it fall short of an innovation upon the well settled practice, if, indeed, that learned judge could be held to mean (as I think he cannot be) what at first blush his language would seem to import. If the language be interpreted to mean that during the term at which a decree of confirmation is rendered the decree may be set aside for good cause shown, and the exception to the report then entertained, or that a petition to rehear the decree of confirmation is, in some sense, equivalent to an exception to the report which has become merged in the decree, then, in either event, the proposition is not in conflict with the rule as understood, to wit: that a decree once passed, and the term ended, can only be disturbed by petition, bill of review, bill to impeach, or by appeal, as the case may be. But however this may be, no such proposition was decided, for none such was involved in the case, that, like this,

being a case in which the proceeding was by petition to rehear. In the succeeding paragraph Judge Staples says: "It is, however, unnecessary to consider this point further, because the appellee did not rely upon a mere exception, but filed his petition for a rehearing, which it was competent for the court to entertain so long as the decree was interlocutory." The case is direct authority, too, for the rule of practice above laid down, it being held in that case that it was not error to grant the rehearing *and correct the commissioner's report.* In fact, the practice in the case in hand (being by petition to rehear), however defective the case on its merits, contravenes the practice inaugurated by the court below.

As to the decree of June 1st, 1881, except that while pursuing the line less distinctly marked out by the decree of May 29th, 1878, it goes much further and actually "*decides*" in terms that there are errors apparent on the face of the reports of Commissioners White and Louthan, ignores or fails to take any notice of the report of Commissioner Louthan, then in and made in obedience to the former decree of May 29th, 1878, unasked, regrants the rehearing granted by said last-named decree, and recommits the cause with express directions to overhaul the settlement of Commissioner White and restate and settle the accounts of Mrs. Nelson as executrix, upon the principles indicated in the paper in the handwriting of the judge of the court, marked "X."

The paper "X" is in the usual form, and seems to be a full statement and settlement of the accounts of the executrix in detail, debits and credits, from the commencement of her administration, regardless of the settlements previously made and confirmed. By it, Mrs. Nelson, theretofore a creditor of the estate for a large amount, is brought in debt thereto in the sum of $12,380.62, with interest from January 1st, 1876. Surely this is a startling result, one that should be based on something more substantial than the general statement that "many" of the debts paid in full by the executrix were improperly so paid

and credited to her, and ought to be arrived at in the regular way.

After *deciding* that errors did exist, but pointing out none; after directing a restatement and settlement of accounts long since confirmed without any objection from any source, and which even the petition for rehearing did not in terms ask to disturb, and after devising a scheme of settlement, and fully and in detail stating the account accordingly, the court again, by this decree, refers the matter to a commissioner for proof. Proof of what? It is obvious that by this decree the commissioner was made a mere copyist. It is often necessary and proper for courts to direct commissioners as to the principles upon which to settle accounts, but here the details are gone into, the former settlements overturned, all the accounts, in effect, newly settled, and, in numerous particulars, upon wholly erroneous principles. But it is not necessary to examine these settlements in detail, it is enough to show that the decrees directing them are erroneous.

It would, indeed, be a case of extreme hardship if any rule of law required or authorized what these decrees undertake to do in this case. Mrs. Nelson's rights decreed to her are, so far as disclosed by the record, founded in strict justice. There is no pretence that every dollar paid by her out of her own funds was not honestly paid on debts of her testator, honestly due. And whilst we may look at the long list of debts and say "many" of them seem to have been paid in full, and as but one lien is reported, and that a specific lien, it is possible or even probable that Mrs. Nelson got credits which, if objected to in the proper time and manner, would not have been allowed her; yet as nothing is said in the decree directing the settlement by Commissioner White about reporting any but specific liens, and as he may well have concluded it to be his duty to stop with the directions to him, we are not warranted in inferring that there were not other liens, not specific. Who can say (even granting that some debts have been paid in full while others were not)

that they were not liabilities upon the estate for debts due to the United States, taxes or liens assessed upon the decedent previous to his death, or debts due as personal representative, trustee for persons under disabilities, guardian or committee, as provided by § 25, ch. 126, Code 1873 ? How can we say they were not such ? There is certainly nothing in the record to the contrary. The vouchers are all admitted to be lost; the grave has closed over those having the most intimate knowledge of all that transpired; many of the parties to whom these payments were made have doubtless passed away, and Commissioner White (long since removed from the state, but whose deposition is in the cause) says, while he cannot recall the proofs in detail, he remembers that he was careful in taking the account and that the evidence was satisfactory as to each item allowed by him. And again : The decree confirming Commissioner White's report, in bringing the cause on, does not employ the usual formula—"and was argued by counsel," but, "and *was explained* by counsel." This last circumstance, if standing alone, would be of but little significance, but coupled with the other circumstances named above, it is by no means insignificant.

In view of all these circumstances, and many others disclosed by the record, there being no errors apparent as alleged, nor any pointed to as such, no exceptions taken when all parties were before the commissioner, when Commissioner White's report was confirmed and acquiesced in for many years before this contention was raised, and when by lapse of time, loss of evidence and death of parties, it is impossible to have any new settlement based upon anything other than mere conjecture, it would be nothing less than wrong and oppression to disturb the settled rights of an executrix, long since dead, one against whom the record discloses nothing to her discredit, or against the fairness of all her dealings, and in whose behalf all the presumptions arise.

These principles have the sanction of a long and unbroken

line of decisions, among them *Crawford's Ex'or* v. *Patterson*, 11 Gratt. 374; *Bolling* v. *Bolling and als*, 5 Munf. 340; *Harrison and als.* v. *Gibson and als.*, 23 Gratt. 223; *Tazewell's Ex'or* v. *Whittle's Adm'r*, 13 Gratt. 352; 4 Minor's Institutes, 1249; *Newton* v. *Pool*, 12 Leigh, 144; *Stamper's Adm'r* v. *Garnett*, 31 Gratt. 550; and *Hill and als.* v. *Umbarger and al.*, 77 Va. 653. It follows, from what has been said, that the decree of February 6th, 1883, refusing the prayer of the appellant's petition to rehear said decrees of June 1st, 1881, and May 29th, 1878, is also erroneous. For the reasons given, the said decree of May 29th, 1878, in so far as it granted the rehearing aforesaid is erroneous, and to that extent all proceedings had thereunder are likewise erroneous, and must to that extent be re versed and annulled, and the said petition for rehearing dismissed; that said decrees of June 1st, 1881, and February 6th, 1883, are, as well as all proceedings had thereunder, wholly erroneous and must be reversed, and the cause remanded to be further proceeded in in conformity with the views herein expressed.

LACY, J., dissenting, said:

In the year 1866 Hugh M. Nelson, of Clarke county, died, and his will was probated in the same year. His wife was the sole beneficiary under the will, and she qualified as executrix under the same. In 1867 she filed her bill in the circuit court of Clarke county, in which she asked that the creditors of her husband be convened, and be compelled to prove their debts in that suit, and that they be enjoined from proceeding at law to assert the same; that she desired that all her husband's creditors, of whom she was one, should be satisfied, and their debts paid; that her husband's debts were about equal to his estate, and that she had other large estate of her own in the city of Boston, and that she had already paid some of her husband's debts out of her own property; that after applying the proceeds of

her husband's personalty, it would take all, or nearly all, of the proceeds of the land to pay his debts, saying, "it is, therefore, desirable and proper to make sale of his land as soon as practicable, first having all the claims against the estate audited. This course will avoid an accumulation of costs of suits and interest, and then enable her, *without trenching materially* upon her separate means to satisfy her husband's creditors, of whom she is one," and "that the court will, as soon as practicable, decree an account to be taken of the debts of the estate concerning all the creditors of the same by publication before a master commissioner of the court, to prove their several claims, and enjoining them in the meantime from suing or proceeding at law; that a sale of the land in suitable parcels may be decreed under the supervision of the court, and the moneys arising therefrom distributed and paid over as justice may require."

She filed with this bill her husband's will, wherein, after giving her all the property he had, which he said came by her, he left her his sole executrix, and requested that the court would not ask security of her unless his creditors desired it, "and as she is worth in her own right property double the balance of any estate of mine, which will come into her hands as my said executrix, I hope my creditors will not require her to give security. I wish my said executrix, as soon as possible after my death, to sell my whole estate, both real and personal, and pay off my debts. I wish my said executrix, immediately after my death, to employ counsel able in the law (naming them), to consult and advise with them as to the proper steps to be taken in the premises; and as soon as practicable, after my death, to sell to the highest bidder all my property, pay off my just debts, and if any portion is left after paying all my just debts, I give and bequeath it to my dearest wife and her heirs forever." She filed with her bill also the sales of the personal property of her husband, the deed by which he held title to the land, and a copy of the deed of trust he had given on the land to secure a large debt due Douglas Gordon.

Whereupon a decree was entered referring the cause to a commissioner in chancery, who is directed to inquire into, ascertain, settle and state the several matters of fact and of account referred to in the bill and exhibits filed therewith, and particularly to ascertain and state, 1st. The amount and value of the personal estate of Hugh M. Nelson, the testator, which has come into the hands of complainant, his executrix, or to which said estate was entitled; 2d. The *amount and character* of the debts due from said estate, distinguishing such as are specific liens, and upon what part of his estate; 3d. The real estate of which testator died seized, any specific liens thereon, and what payments, by whom and out of what funds have been made since his death; 4th. What payments of debts due from the estate have been made by his executrix before and since the probate of his will and out of what funds; 5th The value and annual value of his real estate, and whether the outstanding debts, including such as the executrix may have paid out of her separate estate, could be discharged in a reasonable time out of the rents and profits; 6th. A settlement of the executorial account of the complainant so far as she may have proceeded up to the time of such settlement. To convene the creditors, take proof of their debts, stating the same and their character, report whether a sale of the real estate be necessary, &c.    And leave was given the "executrix, *in case any of the creditors shall be seeking to obtain any undue advantage or impose unnecessary costs by proceedings at law, to apply by petition,* stating circumstances upon the proof of this, *for orders restraining such proceedings.*"

This order was executed by the commissioner and in 1868 he reported with an account of the debts and their character showing *only one preferred debt,* and reporting then the debts of the appellees, Kownslar and others, which it is now claimed they have lost by their *laches,* and so held in their opinion by the majority. The said commissioner also reported as directed an account of the executorial account so far as she had proceeded.

The report showed an. amount of proved debts of $27,770.76, and a claim of the executrix for payment, unsupported, as the commissioner states, by any evidence except the unsworn statement of her attorney in Boston, of $8,627.06. The effect of the opinion of the majority is to pay this unproved debt wholly unsupported by any legal evidence and leave unpaid the legally proved and duly ascertained debts mentioned above as due to the appellees, Kownslar and others, and the ground for this decision which reverses the circuit court and the well established rule of law as well, is that the said creditors were guilty of *laches* in maintaining their claims.

The statute provides, that when the assets of the decedent in the hands of his personal representative, after the payment of funeral expenses and charges of administration, are not sufficient for the satisfaction of all demands against him, they shall be applied first to the debts due to the United States; secondly, to taxes and levies assessed upon the decedent previous to his death; thirdly, debts due as personal representative, trustee for persons under disabilities, guardian or committee, when the qualification was in this state, in which debts shall be included a debt received by a husband acting as such fiduciary in right of his wife; fourthly, *all other demands ratably.* No payment shall be made to creditors of any one class until all those of the preceding class or classes shall be fully paid; but a personal representative who, after twelve months from his qualification, pays a debt of his decedent, shall not thereby be personally liable for any debt or demand against the decedent of equal or superior dignity, whether it be of record or not, unless before such payment he shall have notice of such debt or demand. Chapter 126, sections 25, 26, Code of Va., 1873.

This executrix paid the debts without regard to this statute. And when the real estate was afterwards sold and bought by her, she is excused by the opinion of the majority from paying for it, upon the ground that she has thus become a creditor of the estate. She did become a creditor, so far as she paid debts,

which are duly proved; but does the unsworn statement, the mere letter of a lawyer in Boston, prove this? Could she, however, thus become *a preferred creditor?* Did she acquire thus any other right to be paid in full than other creditors, in the teeth of the statute, which declares that the debts shall be paid ratably. It is said that the report does not show that these debts were not of superior dignity. I think it does. The reference to the commissioner was to report all debts, their amount and character; he does report them, and their amount and character, reporting one preferred debt, and all others without distinction. But it is said this report was not excepted to, and was confirmed, and that it has remained too long to be disturbed. Now, what sort of foundation is there for this position? This estate was in the hands of the court to be administered. The court has here taken an account of all debts, their amount and character.

The report only reported the debts and their amount and character, and the statement of the transactions of the executrix so far as she had proceeded, and a balance appeared in her favor of $2,535.82, as of January 1st, 1868; she had only then received $5,878.21. The report in no particular appeared to be a final settlement, nor, indeed, a settlement of any sort. It only purported to be a statement of affairs so far as they had progressed; large amounts were still to come in and be disbursed from the sales of real estate valued at nearly $50,000. The object of the suit was chiefly to sell this real estate; the prayer in the bill was for the sale of this real estate; it had not yet been sold. The reference to the commissioner was to report concerning this real estate. On what was an exception to be based? There was no order for disbursement or distribution. What the executrix had done might or might not appear to be a violation of the rights of any of the parties, when the assets were all brought in; and the commissioner himself stamps upon the report its informal character and want of finality, for he concludes by saying: "It may be proper to state that I have no doubt that the complainant has paid more money for the estate

than she is credited with in the foregoing account, *but she has kept no account,* and I could only credit her with the amounts evidenced by such vouchers as she has presented."

As to the $8,627.06, it was only reported as a claim against the estate on the part of the executrix, presented to the commissioner *and unproved.* The decree of the court approved and confirmed the report, ordered a sale of the real estate to meet the debts of the estate generally, and concluded thus: "And it being suggested, as also appears by said commissioner's report" (the $8,627.06 may be here referred to), "that there are other outstanding claims against the estate, the *said report is recommitted* to the same master commissioner under the same terms as the former order, to audit and state and report to the next term of the court all such claims," and perpetuated an injunction against Arnett, guardian, &c. Now what part of this report was confirmed? The value of the personal property was reported; the debts due the estate, and their character, one being reported as the only lien upon the estate, real or personal; the value of the real estate as of $48,125, the debts, so far as ascertained, at $27,070.79; that the land would have to be sold, and should be divided into two parts. All this was definite, and concluded by the report, and approved by the court; but there was no complete report of the debts, and *the report was recommitted.* Until the debts were ascertained, and the assets brought in, it could not be known whether the debts could be paid in full or not, and if, in plain violation of the statute, any debts had been paid in full, whilst others of the same class had been omitted, was not this at her own risk? But there was nothing yet developed to show either that the debts had been paid in full, or that all debts would not be paid in full. The effect of the report was not of more effect than to report a statement of some of the debts and the payments made. The payments, which the commissioner so reports, were chiefly payments on the Gordon debt, which had priority over all others as to the main source of supply for

the payment of debts—the real estate.  Was there then any reason for exception to this report?  Was any creditor in anywise concluded by it?  The charge of *laches* against the creditors for this reason is altogether groundless.  The land, the whole of which had been valued at $87.50 per acre, was divided into two parts as the commissioner had recommended, and two hundred and fifty acres sold to the executrix at $100 per acre, which contained all the improvements, including the elegant mansion thereon.  This was less than one-half the farm which contained five hundred and fifty acres, three hundred acres being left unsold, and the proceeds of the sale so far made, together with the personal property sales, was enough to satisfy the proved debts; and if this money had been promptly paid, the accumulation of costs of suit and accumulation of interest, which the complainant seemed to dread so much when she filed her original bill in the cause, might have been prevented.  But she did not comply with her purchase.

This sale was reported to the court October 16th, 1869, and the fact reported that $7,500 had been offered for the residue which had been declined; which report was approved by the court October 18th, 1869, and there was decree for sale of residue of the land on November 3d, 1870.  More than a year afterwards, the same special commissioner reported again that he was now offered only $15 an acre for the three hundred acres, and it should not be sold for less than $40 per acre; which report contained the following significant language: "With regard to the sale to Mrs. Nelson, the widow and executrix, which the court approved and confirmed, the undersigned reports, that it having been well understood that Mrs. Nelson had not the cash means to comply strictly with the terms of sale, whilst the arrangement was highly beneficial to the creditors in *securing the satisfaction of their claims in a reasonable time,* the commissioner has not attempted to enforce her purchase by any attempt to resell her land, has made no deed, but

allowed her to pay in discharge of the specific lien upon the whole land as much as she could from other sources. Thus she has actually paid upon the Gordon deed of trust (*the first and only specific lien*) since the last term, about $1,500, and expects to pay during this term $1,000 more. She has, besides, paid *interest* upon some of the other *claims*, and has indeed substantially complied with the terms of her purchase. Under all the circumstances, your commissioner would recommend *as best for the creditors that the matter be left open,*" &c. The court, the executrix, and the special commissioner, thus appearing. by the record as having full in view all the time "*what was best for the creditors,*" and what "*ensures the satisfaction of their claims in a reasonable time.*"

The creditors, who now are to lose their claims for their *laches* in not pressing with more diligence their collection, did not remain satisfied with these fair promises and this commendable regard for their best interest very long, but on the 6th day of June, 1872, moved for a rule, which was awarded against this purchaser, to show cause why she should not comply with the terms of her said purchase, or have the said land resold at her cost and risk. Upon the hearing of the cause upon this rule and the said report of special commissioner, mentioned above, on the 8th of November, 1872, the court declared its opinion that Mrs. Nelson had not been in default in her payments, and discharged the rule, and made an order of reference to take a further account of debts due by the estate.

It would seem that neither the court in administering this estate, nor the executrix at this time, considered these creditors as wanting in diligence in demanding their debts. Their effort to speed the progress of the cause and to get in the assets of the estate was defeated. They were then exercising *too much diligence* and concern about the debts which they have been considered as abandoning by their want of diligence.

The report under this order was returned May 30th, 1873,

and $1,807.93 more of debts reported. On the 24th of February, 1874, not having yet complied with her purchase, the executrix came in and filed her petition for dower, upon the ground that she did not know the amount of her husband's debts at the time of his death. And alleging, that "she is a large creditor of her husband's estate, on account of her payment of debts which have not been taken into account, and praying that an *opportunity might be given her* of proving the same before a commissioner." *This was in* 1874, and her husband *died in* 1866. Her diligence in the matter of electing as to taking under the will, or demanding dower, had not been very striking during the eight intervening years.

And further she says: "Petitioner has, since the death of her husband, occupied the dwelling and curtilage, and her son has occupied and cultivated the farm." And she agreed to have her dower commuted, and asked to have that done. This led to another decree of reference—for an account of the debts the executrix had paid; the amount of the real estate again; the value of her dower, and a further account of debts—May 19th, 1874. Her deposition was taken to show that she had made no election to take under the will, and her son's deposition as to his entire control of the farm.

Her son says: "I have had control of the farm. I have had it in my possession to do as I chose with the proceeds. I cultivated the farm just as I chose. My mother has had the use of the house and orchard; my mother has never taken possession of the estate as devisee of my father." The anxious creditors who had been so long kept at bay, and who, upon their motion for a rule to compel her to comply with her contract of purchase, had been informed by the court that she was in no default in complying with her purchase of this land, had, perhaps, thought that she was at least holding it as purchaser, or this long enjoyment of undisturbed possession of this valuable estate by the son would not have been without earnest protest by them.

The commissioner reported that she was entitled then to elect, and that her dower so elected was worth $10,562.99. This commissioner took the report of 1868, so far as it went, as a basis, and reported the debts and the executorial account as of that date. She was allowed the unproved debt of $8,627.04, stated in supplemental statement of commissioner's report of 1868, and the report brought the estate in debt to her $15,816.68 of principal, and $5,973.81 of interest, aggregating $21,790.44 ; and a further account was reported of debts of $3,780.05 ; and the special commissioner again reported that he had been unable to sell the three hundred acres of unsold land.

The creditors now excepted: 1st. Because dower is allowed her ; 2d. Because she is allowed credit for all of the debts paid by her, many of them being payments in full, and thus defeating the rights of other creditors who have not received anything to a distribution *pro rata* with those paid ; that if Mrs. Nelson had paid the debts in full as executrix, she had committed a *devastavit* in not paying all *pro rata;* and if she claimed as assignee of the debts paid, she could stand in no better position than the creditors who have been paid. The cause was submitted to the court for decree therein in vacation, any exception to commutation being withdrawn ; this was in June, 1874. The circuit court kept the case until March, 1875, when a decree was rendered overruling all the exceptions, and by consent commutation of dower was allowed the widow, not to preclude an appeal to be hereafter taken by the creditors.

It is too clear to be disputed, and is in effect admitted, that all the debts the widow had chosen to pay were paid in full, while other creditors were paid nothing on their debts which appear to be of equal dignity. This is contrary to the law of this state ; but the excuse set up for it is that the creditors had so long acquiesced in these payments and that now upon the authority of *Harrison* v. *Gibson, Stamper* v. *Garnett* and *Hatcher* v. *Hall,* by their *laches* they have lost their right to demand their *pro rata* share of their claims under the law of this state. This is a

singular use to make of these cases.    What *laches* can be ascribed
to these creditors ?    They have been in court pressing these debts
with all the means at their command from a period commencing
within a year after the death of the debtor.    They were en-
joined, in effect, at the outset from claiming their debts in any
other suit; they have been convened and have proved their debts;
they have submitted themselves to the court as they were com-
pelled to do; they have seen the assets brought under the con-
trol of the court, the whole estate taken in hand by the court;
they have been assured that the chief object of the executrix
was to pay their debts in full in a reasonable time and with as
little delay as possible.    They have been assured by the court
that in its opinion the indulgence to the executrix in her delay
in complying with her purchase was the best for their interest.
Not being able to see how it could be so, they have come in and
demanded that by summary proceeding she be compelled to
comply with her purchase, but they were promptly suppressed
by the court and compelled to sit quietly by while the court
held this valuable property in its own hands, enjoined them
from touching it, and protected the executrix and her son in the
use and full enjoyment of it without rent or charge, and are
then told, after the lapse of eleven years of futile endeavor on
their part, and complete and undisturbed control of all the
property (under the wing of the court) by the executrix and her
son: it is true that the law has been disregarded and some
debts paid in full and others not paid at all by the executrix,
but you should have prevented it; it was only by your acquies-
cence that this was possible ; you have lost your debts by your
*laches*.    All this and more they have alleged in a petition filed
by them in the cause subsequently for a rehearing.    In 1875
the residue of the land was sold to the son for $5,775.    This
was reported to the court November 11th, 1875, and it was
referred to one of the commissioners of the court in November,
1876, to report what amount each creditor yet unpaid would get

in the distribution of the small funds now in hand. No furthei proceedings appear in the record until May term, 1878, when the petition for a rehearing was filed by the creditors, which was allowed as to the rights of the creditors to have their debts paid *pro rata*; this is assigned as error in this appeal. The account was then taken upon this basis of the equal rights of the creditors under the law to a *pro rata* share of the estate, and on the 1st of June, 1881, it was decreed accordingly, and this is assigned as error by this appeal. Other depositions were then taken by the appellant, and in February a petition was filed for a rehearing of the decrees of March 29th, 1878, and June 1st, 1881, by the appellee, which was denied by decree of that date, when the appellant applied for and obtained an appeal to this court.

Some alleged errors in the commissioner's report are set forth in the argument, but where interest has been allowed on the whole item on one side, it has been so allowed on the credit on the other, to the period when the rest is had, and the result is the same as if the credit had been applied at the time contended for ; and there is no error in the account.

I have not seen, nor do I think the record, upon the closest scrutiny, discloses any *laches* or neglect on the part of the appellants in the prosecution of their claims. The only delay has been on the other side, and under the authoritative power of the court, which the appellees could correct only by appeal, and under the decisions of this court, they were entitled to wait until final decree in the cause before they appealed. They obtained a correction of the error against them by a petition for a rehearing, and in this they only exercised an undoubted right.

I say nothing upon the question of election under the circumstances of this case. But I am clearly of opinion that there is no error in this cause of which the appellant can complain. The effect of the opinion of the majority is to deny to the appellees their plain legal rights, and I, with all deference, think

it is unsustained by any precedent. No case has been produced where the statute for the *pro rata* distribution of assets has been thus disregarded, and I venture to say that none can be found; but as the decision of this court, it is authority to which the appellees must bow. I am of opinion to affirm the decree of the court below.

LEWIS, P., and HINTON, J., concurred in the opinion of RICH-ARDSON, J.

FAUNTLEROY, J., concurred in the opinion of LACY, J.

DECREES REVERSED.