# Richmond

THE FIRST NATIONAL EXCHANGE BANK OF ROANOKE, GUARDIAN OF THE ESTATE OF NELLIE WHORLEY STONE v. A. L. HUGHSON, AND COLONIAL-AMERICAN NATIONAL BANK, EXECUTORS OF THE ESTATE OF EUSTACE B. STONE, ET AL.

March 9, 1953.

Record No. 4039.

Present, All the Justices.

The opinion states the case.

*Hazlegrove, Shackelford and Carr, Joseph Wysor Smith,* for appellant.

*Woods, Rogers, Muse and Walker, Tom S. Fox, Copenhaver, Edwards and Barrett, A. L. Hughson, Kossen Gregory,* for appellees.

MILLER, J., delivered the opinion of the court.

On February 4, 1952, The First National Exchange Bank of Roanake, guardian of Nellie W. Stone, incompetent widow of Dr. Eustace B. Stone, deceased, filed its bill in equity against A. L. Hughson and Colonial-American National Bank, executors of decedent's estate, and against the Baptist Orphanage of Virginia, Eugenia W. Stone, and others, legatees under his will.

The primary purpose sought to be accomplished was to have the court renounce, or authorize the guardian to renounce, the provisions made in Dr. Stone's will for his widow, and direct his executors to deliver to complainant as guardian of Nellie W. Stone, all property to which she would have been entitled upon her renunciation had she been competent. Certain interested parties and beneficiaries opposed renunciation. In their answers they proposed, and four legatees offered, alternative plans (Plan 1 and Plan 2) to set up a special trust for the widow in the property bequeathed to them. From this trust the guardian would receive the income for support of its ward during her life. If necessary, the trustees named in the trust would also be allowed to invade the corpus and pay to the guardian for the support of the widow such part thereof as might be needed. The part not thus used would, upon the widow's death, pass to the four legatees as nearly in accordance with the terms of the will as possible.

By decree of April 21, 1952, the court declined to renounce and accepted, with slight modification, Plan 2. From that decree the guardian sought and obtained an appeal.

An intelligent understanding of the problems presented requires that the terms of an *inter vivos* trust established by Dr. Stone before his death for the benefit of his wife during her life, pertinent provisions of his will, the terms of the plans to establish the special trust for the widow as proposed by the legatees, and other relevant facts, be stated in detail.

By written instrument of April 1, 1947, Dr. Stone transferred certain personal property to Colonial-American National Bank and G. C. Holcomb, trustees, and thereby set up a trust under the provisions of section 5157, Code of 1942, (section 55-19, Code of 1950) for the benefit of his wife. When the instrument was executed, the property included in the trust was worth about $52,000. Under its terms, the trustees could use the income for the support and maintenance of Nellie W. Stone during her life, but income that accrued and was unused was to be added to the principal. In event the income was insufficient to provide for Nellie W. Stone, then after, but only after, she had used all of her individual estate, could the trustees invade the principal to provide for her maintenance. Any of the corpus not so used for the widow was to pass at her death to named parties who were settlor's brothers and nieces.

At the time of Dr. Stone's death on April 17, 1951, his wife was seventy-five years old (said by defendants to be seventy-seven), and she had become physically helpless and hopelessly insane. She was a patient at Lewis-Gale Hospital, Roanoke, Va., where she is still confined, and constant nursing attention is required for her. Income from the *inter vivos* trust had not been used as it accrued, and the principal, thus augmented, had by March 20, 1952, increased to $63,077.

Dr. Stone's will, dated September 8, 1950, was admitted to probate April 21, 1951. Testator left surviving neither father nor mother, and no direct descendants by blood or adoption, but he was survived by brothers, nieces, nephews, and other kin.

Excepting certain provisions of the will which have no bearing upon this controversy, it is, in part, as follows:

"(3) I give and bequeath unto my dear wife, Nellie W. Stone, the sum of Twenty Thousand Dollars ($20,000.00), which sum is to be delivered by my executors to The Colonial-American National Bank, Trustee, and said sum is to become a part of the trust fund heretofore created by me for the benefit

of my wife. This is in addition to the proceeds of insurance policies on my life, which I have made payable to my wife, and the income from the trust fund above mentioned, which I have previously established for her benefit. I direct that the bequest of $20,000.00 be the first charge on my estate and be paid to The Colonial-American National Bank, Trustee, by my executors before any bequest hereinafter provided for are paid out of my estate.''

Here follow paragraphs 4 to 8, inclusive, and by the bequests contained therein totaling $98,000, monetary gifts are made in varying amounts to fifteen different people, *i.e.*, testator's brothers, nieces, nephews, a great-niece, and two parties bearing no blood relation to him. The last bequest mentioned in paragraph 8 is to a niece, Eugenia W. Stone, for $15,000, thus leaving $83,000 as the sum bequeathed to the other fourteen legatees mentioned ahead of her.

The will then continues:

''(9) I give and bequeath to the Goodwill Industry and Gospel Mission of Roanoke, Virginia, Incorporated, the sum of $2,000.00.

''I give and bequeath to the Grandin Court Baptist Church of Roanoke, Virginia, $500.00.

''All of the above bequests are to be paid by my executors in the order of their priority, in the event that my estate is not sufficient to pay all of them.

''(10) All the rest and residue of my estate, both real and personal, of every kind, and description, wherever situated, I give, devise and bequeath to the Baptist Orphanage of Virginia at Salem, Virginia.''

Paragraph 11 is unimportant; Paragraph 12 nominates the executors, and among other things, provides as follows:

''* * * I further direct that my executors distribute all United States, State and Municipal bonds and all notes, bonds, and corporate stocks left *after all Federal taxes are paid,* to the legatees above designated, but in order to make an equal and unquestionable distribution, it may be necessary to have some of the stocks reissued in smaller blocks. I do not want the bequests of my relatives to be paid in cash, but in stocks, bonds or notes, as near as possible.

''The bequests to the Goodwill Industry and Gospel Mission

of Roanoke, Virginia, Incorporated, and the Grandin Court Baptist Church of Roanoke, Virginia, are to be paid in cash.'' Emphasis added.

The two insurance policies on testator's life (mentioned in Paragraph 3 of the will, but which do not pass thereunder) in which his widow is beneficiary provide for payments to her beginning as of insured's death of $49.20 and $50.00 per month for the term of 120 months and 240 months respectively.

It was shown by the testimony of Dr. W. R. Whitman, who was thoroughly familiar with Mrs. Stone's condition (but whose records showed her to be about seventy-eight years old when he testified on March 31, 1952), that her life expectancy was about four years. The yearly cost of supporting and caring for her, which includes keeping graduate nurses to serve her twenty-four hours a day, amounts to about $16,440. That sum could be reduced to about $13,700 if practical nurses were employed for her at the hospital.

On May 11, 1951, when the guardian qualified, Nellie W. Stone was possessed of an estate worth $29,696, but as of the time of entry of the decree appealed from $9,321 thereof had been used for her support, and her estate thus reduced to $20,375.

After testator's death his real estate was valued at $13,500, and his personal estate was appraised at $244,194, *i.e.,* a total of $257,694.

It appears from a stipulation of counsel that the funeral expenses, debts, and cost of administration that have been paid amount to $14,700, and further amounts that will have to be expended will not exceed $10,000, *i.e.,* a total of $24,700. Thus testator's *net personal estate,* before charged with taxes, is $219,494, and his real estate is worth $13,500, making a total net estate of $232,994. If his widow had been sane and had elected to renounce the will, or if the court had renounced for her, she would have received one-half of the personal property, *i.e.,* $109,747, and dower with a commuted value (as of age seventy-six when the bill was filed) of about $1,155. This makes a total estate of $110,902, in which she would thus obtain full ownership as contrasted with the bequest of the income from $20,000, with the right to use the principal thereof upon exhaustion of her individual estate if no renunciation be had.

The answers filed by defendant executors and by Eugenia W. Stone, Goodwill Industry and Gospel Mission of Roanoke, Inc., Grandin Court Baptist Church, and the Baptist Orphanage of Virginia and others, are in the nature of cross-bills. They admit the purely factual allegations of the bill, oppose renunciation, and the four above-named defendant legatees submit to the court two plans (Plan 1 and Plan 2) to establish with their bequests and devise a special trust, which, they say, would be to the interest of the widow to accept. By these plans it is proposed that the bequest of $20,000 to the widow be added to the *inter vivos* trust of $63,077, thus increasing it to $83,077, and that all other bequests in the will down to and including a gift of $10,000 to Sam W. Stone in Paragraph 8 thereof, totaling $83,000 be paid. Thus $103,000 of the bequests will be paid in accordance with the precise terms of the will. When that sum and $24,700 used and to be used for payment of debts, costs of administration, etc., are deducted from the total estate of $257,694, there is left $129,994, to which the four legatees would be entitled. With this fund of $129,994 they propose to create the special trust from which the trustee shall pay the income to the guardian for the incompetent widow during her life. Plan 2 also provides that in case the income from the *inter vivos* trust of $83,077, the income from the incompetent's present individual estate of $20,375, the income from the special trust of $129,994, and the $99.20 monthly insurance payments, which income from all of these sources would total about $10,528 a year upon a return of four per cent on the three principal sums, be insufficient to provide for the incompetent, then the corpus of the funds be invaded. If this be necessary, it is to be done by first subjecting the special trust of $129,994, next the widow's estate of $20,375, and lastly the principal of the *inter vivos* trust of $83,077. If the principal of the special trust of $129,994 need be invaded, the portions thereof advanced by the four legatees are to be subjected in the inverse order of their dignity in the will. This would result in the legacy willed to Eugenia W. Stone being the last of that fund to be used.

Plan 1 differs from Plan 2 in the following respect only: If the corpus of the funds has to be used for the incompetent's care and support, then under Plan 1 the principal of the *inter vivos* trust is to be *first* subjected, next the widow's individual estate is to be used, and lastly the principal of the special trust.

In short, it appears that if the widow had been competent and renounced the will, or if renunciation had been decreed, the estate of the decedent of which she would have obtained full ownership would have been $110,902, less $2,100 state and federal taxes, which, it is conceded, would be chargeable to her, *i. e.*, $108,802. With the *inter vivos* trust of $63,077, and her own estate, reduced as it had been to $20,375, she would have enjoyed the income from the total sum of $192,254, exclusive of the $99.20 per month insurance payments. She would also, in the ultimate event, have had the right, if need be, to use the entire over-all corpus of $192,254.

Upon refusal of the court to renounce and its acceptance of Plan 2 as modified, she will secure the sum of $9,321 to restore her depleted individual estate to $29,696, but she will obtain absolute ownership in no other part of testator's estate. She will, however, secure the $20,000 legacy as bequeathed, which is to be added to and thus increase the *inter vivos* trust to $83,077. And the special trust of $129,994, less the sum of $9,321 decreed to her to restore her individual estate, *i.e.*, $120,673, will be created for her upon the terms specified. She will thus under Plan 2 be afforded the income from the total sum of $233,446, exclusive of $99.20 per month received from the insurance policies.

However, if the plan is put into effect, it is not known, nor can it be now determined what federal estate taxes will be chargeable to the estate, or out of what funds payable. Upon acceptance of the plan, the widow would not receive her share outright as upon renunciation, and thus could not qualify for the permitted marital deduction.[1]

The guardian insists that the federal estate taxes would be at least $46,000, and because of the directions in the will, would be chargeable to the residuary estate under section 64-155, Code of 1950, and would thus impair the special trust that much. That would, in turn, reduce the aggregate estate from which the widow would receive the income from $233,446 to $187,446. Defendants argue that if there is no renunciation, then the residuary estate and other bequests to the charitable institutions will have vested, and the taxes chargeable to the entire estate will be approximately $14,000. They insist that under section

[1] Act of April 2, 1948, c. 168, Title III, secs. 361(a), 362, 62 Stat. 117, 121; Act of July 1, 1948, c. 789, sec. 1, 62 Stat. 1214; 26 U. S. C. A., sec. 812(e).

64-151, Code of 1950, that sum will be prorated among all legatees. Yet in either event, the situation presented appears fruitful of expensive tax litigation, and if the residuary estate be charged with $46,000 as feared and the over-all estate from which the widow would receive the income thus reduced to $187,446, that would leave less than the estate of $192,254, from which she would enjoy the income upon renunciation. And it is to be remembered that by renunciation she would also obtain absolute ownership in $108,802 thereof after payment of all taxes chargeable to her.

Fearful that the court might not elect to renounce the provisions of the will for the widow, and contending that the guardian had that power, counsel for the guardian on April 21, 1952, undertook to accomplish renunciation by filing in open court a written instrument of such import and that fact appears as a part of the record.

The guardian contends that this written renunciation was within its powers and effective. If not, it says that the widow's right to renounce the provisions made for her, whether she be sane or insane, is an absolute right paramount to rights of heirs or legatees, and that the court should have renounced for her. It also insists that it was beyond the right and power of the court and an abuse of its discretion to accept Plan 2 as modified, and that its acceptance amounted to a revision and modification of the terms of the will, and is not to the best interest of the widow.

Defendant executors and legatees assert that the right to elect between taking under the will or renouncing its provisions is personal to the widow and cannot be exercised by the guardian, nor can the guardian demand as of right renunciation by the court. They contend that the guardian can only request the court to exercise a sound discretion based on all the facts and determine therefrom what should be done, and its refusal to renounce and its acceptance of Plan 2, as modified, was within the broad discretion of the court and in the interest of the widow. Their position in this respect is stated thus:

"(c) In exercising its discretion the court will be guided by the following principles of law:

"(1) The right to dispose of one's estate in accordance with his own wishes is a sacred right which a court of equity will not disregard or destroy.

"(2) The sole reason for giving a widow the right to renounce her husband's will is to insure adequate provision for her maintenance and support.

"(3) The matter of enriching the widow's estate and passing something to her kinspeople has no place in the chancellor's consideration.

"(4) The kinspeople of the widow have no claim on the estate of her husband.

"(5) The fact that a mentally incompetent widow has no need for money except to provide for her maintenance and comfort may be considered.

"(6) After making adequate provision for the maintenance and comfort of an incompetent widow, the court should endeavor to dispose of the residue of the husband's estate in accordance with the testamentary intent."

We must now apply the pertinent provisions of the statutory law of Virginia to the recited facts. Sections 64-13, 64-16, and 64-27, Code of Virginia, 1950, provide as follows:

"64-13. *When and how benefits of will may be renounced.* When any provision for a husband or wife is made in the consort's will, the survivor may, within one year from the time of the admission of the will to probate, renounce the provision. The renunciation shall be made either in person before the court in which the will is recorded, or by writing recorded in the court, or the clerk's office thereof, upon such acknowledgement or proof as would authorize a writing to be admitted to record under chapter 6 of Title 55.

"64-16. *Rights upon renunciation or when no provision made by will.* If renunciation be made, or if no provision for the surviving husband or wife be made in the will of the decedent, the surviving consort shall, if the decedent left surviving any direct descendants or a legally adopted child, or descendants of any deceased adopted child, have one-third of the surplus of the descendant's personal estate mentioned in Section 64-11; or if no direct descendants or adopted child of the testator, or descendants of a deceased adopted child, survive, the surviving consort shall have one-half of such surplus; otherwise the surviving consort shall have no more of the surplus than is given him or her by the will.

"64-27. *Of what a widow shall be endowed.* A widow shall be endowed of one-third of all the real estate whereof her

husband, or any other to his use, was, at any time during the coverture, seized of an estate of inheritance, unless her right to such dower shall have been lawfully barred or relinquished; but if he die wholly intestate and without issue of the marriage which was dissolved by his death or of a former marriage, his widow shall be endowed of one-third of such real estate, as aforesaid, and, in addition thereto, subject to the rights of her husband's creditors, of all the residue of such real estate of her husband; or if he die partially intestate and without any such issue, his widow shall be endowed of one-third of such real estate, as aforesaid, and, in addition thereto, subject to the rights of her husband's creditors and after the rights of the devisee or devisees under her husband's will shall have been fully satisfied, of all the residue, if any, of such real estate.''

Statutory right of a widow to renounce the provisions made for her in her husband's will existed in Virginia in early colonial days.

An act to that effect was passed in October, 1705. 3 Hen. Stat. at Large, Ch. XXXIII, Par. IV, at p. 373. This statute enlarged and extended the widow's rights in this respect, which had even at earlier dates been embodied into our statutory law. See 2 Hen. Stat. at Large, Act I, p. 303, and Act VII, p. 212, and *Lightfoot's Ex'rs* v. *Colgin*, 5 Munf. 42.

Chapter XXXIII, Par. IV, of the Act of 1705, follows:

''IV. PROVIDED also, that when any person dies testate, if he leaves one or two children, and no more, he shall not have power to dispose of more than two third parts of his estate, by will, to any other person or persons than his wife; and one third part thereof, at the least, shall be given to her. And if such person shall leave more than two children, he shall not leave his wife less than a child's part, according to the number of children: But if such person leaves no child, then the wife shall have at least one equal moiety of his estate. And if any person shall leave a will, wherein a lesser part of his estate shall be given to his wife than is herein directed, such will, as to so much thereof as relates to the wife, upon her petition to the court where the same shall be proved, shall be declared null and void: And thereupon she shall and may be impowered to sue for and recover, such part of her deceased husband's estate as is hereinbefore directed to be given to her.''

This provision is said by some to have sprung from princi-

ples of the common law brought to the colonies from England. *Cocke's Ex'r* v. *Philips* 12 Leigh 253, 258; *Lightfoot's Ex'rs* v. *Colgin, supra;* 2 Blackstone's Commentaries 492; I Williams on Executors 2. In England, according to Blackstone, as far back as the twelfth century and thus long before the ancient Statute of Wills was passed during the reign of Henry VIII, a man who died without children, but leaving a widow, could give to others only one-half of his personal estate. One-half of his personalty, upon his death, passed automatically to his widow. Minor's Institutes, Vol. III, 2nd Ed. Part I, p. 528, *et seq.;* Blackstone's Commentaries on the Law, edited by Bernard C. Gavit, 1941, p. 505. Yet according to Sir Edward Coke, this was never the general law, but a custom that obtained in certain localities in England, and thus carried solely the force of custom, and that only in those areas. *Cocke's Ex'r* v. *Philips, supra;* Minor's Institutes, *supra.* p. 529.

The quaint wording of the early statute found in 3 Hen. Stat., Ch. XXXIII, Par. IV, has been changed from time to time, and the effect and scope of that enactment altered and enlarged. Now the right of renunciation is given to widow or widower, but the fundamental principle and underlying purpose is retained in section 64-13, *et seq.,* Code of 1950.

The widow's right to her share of her deceased husband's estate thus secured to her by statute is an absolute, paramount and certain right which her husband may not deny her.

This paramount right to share in the estate under and as allowed by statute must be exercised within a year of the time of admission of the will to probate to become effective. That limitation, however, merely restricts the time in which the right may be availed of and does not lessen its certainty. Yet within the year the widow or widower must elect to take by the will or against it, and election to take under the statute forfeits all rights enjoyed and provisions made for him or her in the will. *Mitchells* v. *Johnsons,* (1835) 6 Leigh 461; *Kinnaird Ex'r* v. *Williams's Adm'r.,* 8 Leigh 400; *Findley's Ex'rs* v. *Findley,* 52 Va. 434 and *Nelson's Adm'r* v. *Kownslar's Ex'r,* 79 Va. 468.

"The appellee cannot assert her paramount claim to distribution against the will, and also claim the provision, or any part of it, made for her by the will. Having made her election to take the first, she must give up the last to indemnify the

parties who are disappointed by her election.'' *Findley's Ex'rs* v. *Findley, supra,* at 439.

''By this provision (as the law was), whether the provision for her in this will was much or little, she could accept it independent of and beyond her dower in the real estate, or at her election renounce the provision made in the will, and take *absolutely* her distributive share of the personal estate. \* \* \* In other words, in such case, if she renounced the provision made, or if no provision was made, she was thereby placed in precisely the attitude she would have been in had the husband died intestate as to his personal estate. This is illustrated by many decided cases.'' (Italics added.) *Nelson's Adm'r* v. *Kownslar's Ex'r, supra,* at 477.

■ When the widow fails to renounce within a year, and thus by her inaction elects to abide by the will and accept the provisions, if any, made for her therein, she is not a mere donee under the instrument. She is considered a purchaser for value of the property willed to her for she has, by taking under the will, given up and released the absolute and paramount right secured her by statute which she could obtain by renunciation.

''By operation of law, when she elects to accept the provisions of the will, she thereby becomes, *ipso facto,* a *purchaser for value,* and is entitled to priority over the other named legatees who are denominated by the law writers as 'volunteers', or 'pure beneficiaries' or 'mere objects of the testator's bounty.' '' *Davis* v. *Davis,* 138 Va. 682, 689, 123 S. E. 538; *Everett* v. *First National Bank,* 142 Va. 149, 128 S. E. 450; *Brown* v. *Brown,* 79 Va. 648; and *Borden* v. *Jenks,* 140 Mass. 562, 5 N. E. 623.

The interest of the widow with which the court was dealing and which it was called upon to protect and enforce, was thus a valuable and paramount property right recognized and made certain by statute and not a mere gratuity. Here the court's duty to award to the guardian the full interest to which the widow was entitled must be exercised with regard to that high obligation owed by a court of equity to protect, secure and enforce the right of an incompetent.

■ Before we undertake to say what the court should have done upon the facts presented, it is best that we determine what was the effect, if any, of the attempted renunciation filed by the guardian in open court.

We do not attach to the language used in the recent case of *Crisman* v. *Swanson*, 193 Va. 247, 254, 68 S. E. (2d) 502, viz., "We express no opinion upon the right of the committee or his ward to make the renunciation," the implication that renunciation may be made by a committee or guardian which counsel for the guardian have sought to give to it. In their petition they set out the quoted part of the above sentence and then say:

"Counsel for the plaintiff submit that this language implies that the Guardian, by its sole act, may have the authority to renounce Dr. Stone's will in behalf of Mrs. Stone."

The construction sought to be had is no doubt desired, but it is not justified. The sentence implied no more than what was clearly said, *i.e.*, that no opinion was expressed upon the right of the committee or ward to renounce.

"The right of election is normally personal to the widow herself and cannot be exercised for her by another in her stead." 1 American Law of Property, sec. 5.41, p. 729.

In an annotation discussing the power of renunciation by another on behalf of an incompetent found in 74 A. L. R. 452, 453, it is said:

"Upon the theory that the right of election is a personal right, there is no dissent from the proposition that, in the absence of express statutory authority, the guardian or commission of an incompetent cannot make an election, but such election must be made by or under the direction of a court having chancery jurisdiction over the person or estate of the incompetent." Of like import are 147 A. L. R. 336, 3 *Vernier*, American Family Law, p. 467; and 2 *Pomeroy*, Equity Jurisprudence, sec. 510, p. 436.

The statute, sec. 64-13, does not by express terms authorize renunciation by the sole act of the guardian, and if that power be accorded the guardian, it should be definitely stated or appear by fair implication.

Upon careful consideration of the language of section 64-13, we find in it no purpose or intent to give to the guardian or committee of an insane widow or widower the power to renounce the provisions of a will made for her or him, and thus, clearly there is no implication that can be justly drawn from the language that would confer such a power. *First National Bank of*

*St. Petersburg, Guardian* v. *McDonald, Ex'or., etc.,* 100 Fla., Part One, 675, 130 So. 596. As Mrs. Stone was insane, it was for the court to determine whether or not renunciation should be ordered. The attempted renunciation filed by the guardian was ineffective to accomplish the purpose desired.

In jurisdictions where the power to renounce provisions of a will made for an incompetent spouse is exercised by a court of equity, there is conflict of authority as to what facts and circumstances should be considered and enter into the chancellor's deliberations and what weight should be given to them respectively. In some states a more limited set of facts and circumstances is considered and weighed by the court in the exercise of its prerogative to renounce or not, than in other states. Where this limited field of considerations obtains, emphasis is given to the *value* of the estate to be secured by the incompetent on renunciation as compared to what he or she gets under the will. Where a broader set of circumstances and considerations enter into the deliberations and ultimate action of the court, if the incompetent is adequately cared for in the will, then greater weight seems to be accorded the wishes of the testator as expressed in his will. If the incomptetent be adequately cared for in the will, then the additional monetary value of the estate that could be secured by renunciation is not deemed so important.

Decisions relied upon by the guardian that adhere or substantially adhere to the first view and hold that the value of the estate to be obtained by the incompetent spouse should be the primary, chief or dominant consideration upon which to base or refuse renunciation follow: *Emmert* v. *Hill,* 226 Ill. App. 1; *In Re Hills,* 157 Misc. 109, 283 N. Y. S. 733; *German's Case,* 318 Pa. 200, 178 A. 38; *In Re Stevens' Estate,* 163 Iowa 364, 144 N. W. 644; *In Re Kees' Estate,* 239 Iowa 287, 31 N. W. (2d) 380.

Authorities relied upon by defendant legatees hold that various circumstances other than the amount of the estate to be received by the incompetent should enter into the considerations of the court when it exercises its discretion to renounce or not. Among these authorities, some of which are decidedly to the effect that if the needs and comforts of the incompetent are fully and adequately cared for in the will, then the wishes of the testator, as stated in the will and the interests of other legatees and devisees, should be respected and renunciation denied, are: *Van*

*Steenwyck* v. *Washburn,* 59 Wis. 483, 17 N. W. 289; *First National Bank of St. Petersburg, Guardian* v. *MacDonald, Ex'or., etc., supra; In Re Connor's Estate,* 254 Mo. 65, 162 S. W. 252, 49 L. R. A. (N. S.) 1108; *State ex rel. Percy* v. *Hunt,* 88 Minn. 404, 93 N. W. 314; *In Re Hansen's Guardianship,* 67 Utah 256, 247 Pac. 481; 2 *Pomeroy,* Equity Jurisprudence, 5th ed., sec. 510a, p. 438.

Between these two somewhat divergent views upon the scope and field of circumstances and considerations that should enter into and influence the chancellor in determining whether to elect to renounce or accept for the incompetent the provisions in the will, falls the statement upon the subject found in 57 Am. Jur., Wills, sec. 1528, p. 1039.

"With respect to the factors which are to be considered by the court or guardian in determining whether the election in a particular case should be for or against the will, it may be said that there is general agreement that while the fact that renunciation of the will will result in the beneficiary's monetary or financial advantage is a strong reason for electing to renounce, it is not conclusive; that the circumstance that the incompetent beneficiary is unable to realize or appreciate the value of money may be considered as militating against an automatic decision in favor of an election which will be to the monetary advantage of the incompetent; that the benefits accruing from an election one way or the other to the beneficiary's heirs or next of kin are to be given little or no weight; that the right of the testator to dispose of his property as he sees fit, which is to be respected as far as possible, tends toward an election in favor of the will; and that, ultimately, that choice is to be made which will be for the best interests of the incompetent in the light of all the facts and circumstances shown." Comprehensive annotations on this subject also appear in 74 A. L. R., *supra,* and 147 A. L. R., *supra.*

▮ What is for the ward's best interest is recognized as being the goal to be attained. Yet that end must be arrived at within the framework of the statute for it is the charter by which the rights of the incompetent are given and made secure, and within the limits thus fixed, what is for her best interest must be ascertained. Just what factors should be considered and what weight should be given to them respectively in making that finding, give rise to difficulties and bring about the diversity

of conclusions found in the decisions. But from our view of this case, just what particular considerations should have moved the court in the exercise of its discretion, and what weight should have been given to them and to all of the *facts* and *circumstances* appearing in *this* record which were weighed and evaluated by the trial court, need not be decided.

The statute contemplates and provides for renunciation of the provisions of the will or not, as the widow may determine if sane, but as she is incompetent, the court, in its wisdom and discretion, must *renounce* or *decline* to renounce for her. Its right and power to act for the incompetent by electing to take under the will or renounce its provisions is likewise based upon and derived from the statute. Yet if renunciation be ordered, then the statute, by its express terms, determines what portion of the estate the widow shall receive. If renunciation be denied, then the provisions of the will remain effective as written and determine what she and other beneficiaries receive.

We have been cited to no authority, nor have we found any, which permits or empowers a court of equity to accept or enter into a business arrangement or contract which neither renounces the provisions of the will, nor allows them to operate as drawn by the testator. If the interested legatees be allowed to propose a plan for the court to accept, then there is no good reason why others who would probably be the heirs and distributees of the *hopelessly insane* widow, should not propose a plan. That character of barter and trading on or with the estate left by the testator, the bequests and devises left to the incompetent and other parties, and the statutory rights of the widow, to say nothing of the potential interests of the incompetent's prospective distributees, is not contemplated by sections 64-13, 64-16, and 64-27. It was thus beyond the power of the court to accept the plan and agreement proposed.

■ Dr. Stone died seized of property worth approximately one-quarter of a million dollars. He bequeathed his helpless and incompetent widow the income from about one-twelfth of his estate, *i.e.*, $20,000. At her age, the true value of that bequest—the commuted value of the income—was about $5,500, which is approximately one forty-fifth of his estate. He did, however, provide that the principal of the $20,000 might be encroached upon, but only after imposing harsh terms. As most

of testator's estate was personalty, upon renunciation of this bequest, the widow would obtain nearly one-half of the estate. Clearly, without more, it was to her decided interest that renunciation be had. That being true, it necessarily follows that renunciation of the provisions made for her in her husband's will must be decreed.

The decree appealed from is reversed, and the cause remanded for such further proceedings therein as may be necessary and appropriate and not in conflict with the views herein expressed.

*Reversed and remanded.*

HUDGINS, C. J., BUCHANAN and SMITH, JJ., concurring in result.

BUCHANAN, J., concurring in the result:

The opinion states that there is conflict of authority as to what facts and circumstances the chancellor should consider in deciding to renounce or not renounce the will for an incompetent, under the powers inherent in equity and not derived from a statute.

Between the courts on the one side which hold that the value of the estate should be the dominant consideration and those on the other which hold that weight should be given to various other considerations, the opinion quotes from 57 Am. Jur., Wills, section 1528, page 1039, the statement that there is general agreement that while monetary advantage is a strong reason for electing to renounce, it is not conclusive, and that "ultimately, that choice is to be made which will be for the best interests of the incompetent in the light of all the facts and circumstances shown."

The opinion seems to approve that principle. It says: "What is for the ward's best interest is recognized as being the goal to be attained." Nevertheless, the opinion concludes that just what precise consideration should have moved the court to its action in this case need not be decided. That is because, as I understand, the court must either renounce or not renounce, and if it renounces, then the incompetent must take what the statute gives, no more and no less; but if it refuses to renounce,

that is the end of the matter and the incompetent must take what the will gives, no more and no less.

I think the holding in that respect puts a much too narrow limit on the factors to be considered by the court in exercising its discretion to renounce or not renounce. In effect it denies that the ward's best interest is the goal to be attained; and certainly it repudiates the principle that the choice to be made is the one which will be for the best interests of the incompetent "in the light of all the facts and circumstances shown." In practice, it leaves no discretion in the court other than to decide the simple problem in arithmetic of whether the incompetent will get more by taking what the will gives or what the statute gives. The court must decide that question alone, shut off from "the light of all the facts and circumstances shown."

A fact and circumstance in this case, which the opinion holds the court was not entitled to consider, was the offer of certain beneficiaries of the will to surrender for the use of the widow during her life the $129,994 given to them by the will. Those beneficiaries asserted that it would be better for the widow that the court accept that offer and not renounce the will than to reject it and renounce the will. I do not think that it has been convincingly demonstrated in the record before us that that is true. It clearly appears from the opinion that there is substantial ground for concluding that it is not true. On the showing made, I think the offer should have been rejected and that renunciation on behalf of the widow should have been made by the court. The case should, I think, be reversed on that ground, but not on the ground that the court in this or any similar case should not consider all the facts and circumstances in exercising its discretion in so serious a task. Cases may well arise in which there would be not the slightest doubt that it would be to the interests of the incompetent to accept an arrangement offered by other beneficiaries of the will rather than to renounce the will.

It is true that we have been cited to no case in which that has been done, but neither have we been cited to any holding that it should not be done. In the administration of remedies, an equity court is not bound by the strict rules of the common law, but adapts its relief and molds its decrees to satisfy the requirements of the case. Its purpose is the accomplishment of justice, and it will administer such relief as the exigencies of

the case demand. The absence of precedents, or novelty in incident, presents no obstacle to the exercise of its jurisdiction. 19 Am. Jur., Equity, § 123, p. 123; 30 C.J.S., Equity, § 12, p. 331; *Alexander* v. *Hillman,* 296 U. S. 222, 56 S. Ct. 204, 80 L. ed. 192; *Chapman* v. *Sheridan-Wyoming Coal Co.,* 338 U. S. 621, 70 S. Ct. 392, 94 L. ed. 393; *Baker Sand & Gravel Co.* v. *Rogers P. & H. Co.,* 228 Ala. 612, 154 So. 591, 102 A. L. R. 346.

" 'Equitable remedies * * * are distinguished by their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application; the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties.' " *Turner* v. *Citizens Bank,* 111 Va. 184, 192, 68 S. E. 407, 409.

If a will is to be renounced or not renounced, according to what is best for the incompetent, I can see no reason why the court's discretion should not be exercised in the full light of all the facts and circumstances, rather than within the arbitrary limits of what the will gives and what the statute gives. I do not believe that either principle or precedent requires that a court of equity shall not consider an offer of the kind made in this case in deciding for or against renunciation in behalf of the incompetent, or prevents acceptance of such an offer if acceptance will benefit the incompetent more than a renunciation of the will.

HUDGINS, C. J., joins in this opinion.

SMITH, J., concurring in the result.

After stating that there are two divergent views, the majority opinion seems to adopt a middle view which holds "that, ultimately, that choice is to be made which will be for the best interests of the incompetent in the light of all the facts and circumstances shown." This middle view suggests several factors which should be considered in determining what are the best interests of the incompetent.

However, in the next to the last paragraph the majority opinion emphasizes the wide divergence between the benefits to the widow under the terms of the will and the benefits she

would receive if the will is renounced, and it is said that "Clearly, without more, it was to her decided interest that renunciation be had. That being true, it necessarily follows that renunciation of the provisions made for her in her husband's will must be decreed."

Far from following the middle view, this seems to me to follow the view that the prime factor to be considered is the *value* of the estate that the widow receives by renunciation.

The phrase, "best interests," used as the test to determine whether to renounce, is likely to be given an improper and unwarranted meaning. The best interests of an incompetent are achieved when full security is afforded and her every need and comfort is adequately provided for. What more can be done for *her* interest?

When the terms of a will make adequate provision for all the needs of the incompetent widow, her best interests have been fully served. Her claim against the estate of her husband being paramount and having been satisfied, if adequate provision has been made for her, then the second consideration—the expressed wishes of the testator-husband—must be respected.

My opinion of the considerations that should be weighed in reaching a proper decision leads me to the conclusion that the correct rule may be briefly stated thus: If the needs and comforts of the incompetent widow are adequately provided for by the terms of the will, then the wishes of the testator, as stated in the will, should be respected and renunciation denied. If the provisions of the will do not adequately provide for her needs and comforts, then the trial court should renounce the will, if to do so would more adequately provide for the incompetent.

There is evidence that Mrs. Stone's life expectancy was about four years from March of 1952; however, this should not be controlling, since there is no way to tell how long she will live and it follows that there must be adequate provision for her to cover any and all eventualities.

If there is no renunciation, the total funds available to Mrs. Stone would consist of her personal estate of $20,375, the trust fund of $83,077, and the annual insurance payments during the first ten years of $1,190. Leaving out of account any consideration of legal fees, court costs, and other charges against the principal or income available for the support of Mrs. Stone, it is very doubtful that there would be sufficient funds available

to maintain her for more than six or seven years, based on her current requirements of $16,440 per year. This being the situation presented by the facts in this case, there was only one solution; that is, to renounce the will, since only by renunciation would the widow's needs and comfort be assured.