## Richmond

### Roanoke Engineering Sales Company, Inc.

### v.

### Curtis Rosenbaum and Rosenbaum of Roanoke, Inc.

April 30, 1982.

Record No. 791536.

Present: All the Justices.

550

*Alan G. Fleischer; Keith D. Boyette (G. Marshall Mundy; Hirschler, Fleischer, Weinberg, Cox & Allen; Mundy & Strickland,* on briefs), for appellant.
*Harry F. Hambrick, Jr. (S. D. Roberts Moore; Gentry, Locke, Rakes & Moore,* on brief), for appellees.

RUSSELL, J., delivered the opinion of the Court.

This appeal presents a question concerning the enforceability of a non-competition covenant and the appropriate remedy for its breach.

Harry L. Rosenbaum, Sr., entered into business as a manufacturer's representative in the Roanoke area in 1920, dealing in building supplies. By 1962, the business, which had expanded to encompass branches in Richmond, Roanoke, and McLean, Virginia, and Charlotte, North Carolina, was incorporated as Roanoke Engineering Sales Company, Inc. (RESCO). All of the stock was owned by the owner's four sons — Joseph, Harry, Jr., Robert, and Curtis. Each son served as an officer, director, and manager of a branch office. Harry, Sr., continued to serve as Chairman of the Board. Curtis, the defendant in the trial court, was manager of the Roanoke branch, Senior Vice President, Treasurer, and a director.

In 1970, the four brothers each entered into separate but similar employment contracts with RESCO which defined their responsibilities and compensation. The agreement signed by Curtis provided:

> Agreement made January 1, 1970 and amended January 15, 1977, between Roanoke Engineering Sales Company, Incorporated, a Virginia Corporation, with principal offices in Richmond, Virginia, herein called "Roanoke," and Curtis Rosenbaum of Roanoke, Virginia, herein called "Employee."

Whereas, Employee is presently employed as treasurer of Roanoke, and General Manager of its Roanoke, Virginia, branch

\* \* \* \*

4. For a period of three years after the termination of this agreement, for a reason other than the cessation of Roanoke's business or its bankruptcy, Employee will not, in the territory covered by Roanoke, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be associated in any manner with the ownership, management, operation or control of any business similar to the type of business conducted by Roanoke at the time of the termination of this agreement.

Although the agreement was amended in 1977, the original language quoted above was unchanged. The employment contracts of the other three brothers contained identical non-competition clauses. All were in effect in 1978.

In April 1978, after a policy disagreement with his brothers, Curtis was discharged from all corporate offices and relegated to employment as a salesman. He resigned as an employee and, during the following month, accepted employment as manager of Mahone, Inc. Mahone was a manufacturer's representative in the Roanoke area and a direct competitor of RESCO, selling similar products. On July 1, 1978, Curtis purchased all the assets of Mahone and changed its corporate name to Rosenbaum of Roanoke, Inc.[1]

On October 5, 1978, RESCO filed its bill of complaint in the circuit court asking the court to enjoin Curtis "from violating paragraph 4." After trial *ore tenus*, the chancellor, in a written opinion, ruled that the non-competition clause was "unreasonable in that it is greater than necessary to protect the company in its legitimate business interests, and is unreasonable from the standpoint of Curtis because it is unduly harsh on him in conducting his legitimate efforts to earn a livelihood," and thus unenforceable under the test of *Richardson v. Paxton Company*, 203 Va. 790, 127 S.E.2d 113 (1962).

---

[1] RESCO contends that this is a particularly direct form of competition, confusing to its customers, because the family name had been associated with RESCO's business since 1920.

In *Richardson, id.* at 794, 127 S.E.2d at 117, (quoting with approval from *Welcome Wagon* v. *Morris*, 224 F.2d 693, 698 (4th Cir. 1955)), we applied the following criteria:

(1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than is necessary to protect the employer in some legitimate business interest?

(2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood?

(3) Is the restraint reasonable from the standpoint of a sound public policy?

Non-competition covenants which pass these tests in the light of the facts of each case will be enforced in equity. *Meissel* v. *Finley*, 198 Va. 577, 95 S.E.2d 186 (1956); *Worrie* v. *Boze*, 191 Va. 916, 62 S.E.2d 876 (1951).

The trial court found that the covenant applied to Curtis only as an "employee," not as a stockholder or director of RESCO, that his activities as an employee were carried out only within the territory covered by the Roanoke branch, and that the covenant purported to restrict him from business in territory and business activities in which Curtis was not engaged as an employee of the Roanoke branch. For this reason, the court found it to be unnecessarily broad for the protection of the employer, and unduly harsh to the employee.[2] On the facts in the record, we disagree with this interpretation.

The reference to Curtis as an "employee" in the exordium clause of the contract is, in our view, simply descriptive shorthand which avoids repetition of his name throughout. Its counterpart refers to the other party as "Roanoke" to avoid repetition of its full corporate name. This convenient style evinces no intent to limit the application of the agreement to Curtis' activities as an employee of the Roanoke branch, as distinguished from his functions as stockholder, director, Executive Vice President, and Treasurer. Even if the intent of the parties had been to limit the effect of the contract to Curtis' activities as an employee, it expressly

---

[2] The court's opinion observed that the covenant would be reasonable if the restraint on Curtis were only in the territory covered by the Roanoke branch. Later RESCO moved the court to grant injunctive relief only as to competition in the Roanoke area, but the court declined on the ground that this would be a judicial rewriting of the parties' contract. Since we find the contract enforceable as written, we do not reach this question of partial enforcement.

provides: "Whereas employee is presently employed as treasurer of Roanoke. . . ." In this capacity, Curtis had responsibilities as an employee involving the financial affairs of all four branches.

The branches of RESCO were considered "divisions of the corporation," and were not operated by subsidiaries. Curtis, through his corporate offices, had access to the confidential financial records of all four branches, as well as lists of customers, lists of suppliers, detailed knowledge of overhead factors, pricing policies, and bidding techniques. This knowledge qualified him to be a formidable competitor throughout the territories served by all four branches of the corporation in Virginia and North Carolina. In these circumstances, we conclude that the restriction is no greater than necessary to protect RESCO's legitimate business interest. It is appropriately limited in time and is coterminous in area with the territory in which RESCO did business. It is limited to activities "similar to the type of business conducted by Roanoke at the time of the termination."[3] There is no indication in the record that the enforcement of the restraint would be unreasonable from the public policy standpoint, as an undue restriction on free competition or otherwise. We thus conclude that this covenant meets the tests quoted in *Richardson*, and should have been enforced.

The relief to which RESCO is now entitled presents a more difficult question. The covenant restrained competition for a period of three years from "termination," which occurred on April 29, 1978. The period sought to be protected expired in April 1981. RESCO filed its bill of complaint in October 1978, and noted its appeal in August 1979. An appeal was granted in March 1980 and the appellant's brief was filed in April 1980. Oral argument could not be heard until March 1982, almost a year after the expiration of the protected period. RESCO contends that Curtis has continued his competition in violation of the agreement to the present, enjoying the fruits of his wrongdoing. In the appellant's opening brief, filed while the protected period still had a year to run, RESCO requested this court to enjoin Curtis from violating the non-competition covenant for a period of three

---

[3] This distinguishes the case at bar from the facts in *Richardson*, where a commission salesman for marine paints was sought to be restrained by a non-competition clause from "engag[ing] in any branch of marine or industrial supplies, equipment, services. . . ." The trial court held this to be unduly harsh, overbroad, and unenforceable. 203 Va. at 793, 127 S.E.2d at 115.

years from the date of entry of a final decree.[4] RESCO evidently foresaw that the inevitable delay of litigation would render the issue of enforceability moot before a ruling could be obtained.

Curtis contends that the issue of enforceability of the covenant has become moot by the passage of time, that the court should not write a new contract for the parties specifying a protected period other than that upon which they agreed, and that the case is controlled by *Hallmark* v. *Jones*, 207 Va. 968, 154 S.E.2d 5 (1967). There, an employee of an employment agency had agreed in writing not to engage "in a similar business . . . within a radius of 35 miles from the City of Norfolk for a period of eighteen (18) months following the termination of her employment." She left her employment in August 1965 and promptly went to work for a competing employment agency in the City of Norfolk. Hallmark sued to enjoin her from violation of the covenant "for a period of 18 months from the date of termination of her employment." The trial court held the covenant to be unreasonable and unenforceable. Hallmark's appeal was decided in this court on April 24, 1967, two months after the protected period had expired. In oral argument, counsel for appellee suggested that the issue of the covenant's enforceability was then moot. We agreed, noting that Hallmark had only requested injunctive relief for a period of 18 months from termination of employment, and dismissed the appeal as moot without reaching the merits.

We think that the application of the *Hallmark* holding to the facts of this case reaches an inequitable result. Except for RESCO's six-month delay in filing suit, for which it concedes its relief should be docked, neither party contributed unnecessarily to the delay which carried the time of decision a year past the expiration of the protected period. The fact that the case has been in litigation for three and one half years is attributable to the increasing burdens of the judicial system, not to the litigants. In 1966, when the appeal was noted in *Hallmark*, 797 cases were brought to this court. In 1981, this number had increased to 2,251. It is not surprising that the time for appellate disposition increased from 15 months in *Hallmark* to 32 months in this case. Who should suffer the consequences of this unfortunate delay—RESCO, which was entitled to relief when sought in Octo-

---

[4] RESCO conceded in oral argument that six months should be subtracted from the protected period because of its delay in filing suit, from April to October 1978.

ber 1978, or Curtis, who has been in continuing violation of a covenant which we have held binding on him? The result urged by Curtis would reward the breach of contract, encourage protracted litigation, and provide an incentive to dilatory tactics.

■ Curtis contends that RESCO could have protected itself against the consequences of delayed enforcement by providing for it expressly in the contract, *e.g.*, prohibiting competition for three years from termination or "from the date of entry by a court of competent jurisdiction of a final judgment enforcing the covenant, whichever is later," citing, *e.g., Arrow Chemical Corporation* v. *Pugh*, 490 S.W.2d 628 (Tex. 1972). He argues that RESCO, having failed to so provide, should not now be granted relief. Although some such language might well be prudent in an era of increasing litigation delay, we do not think it to be prerequisite to relief on the facts of this case. The contractual language used here was agreed upon by the four brothers. It was part of a mutual scheme binding each of them equally. It had been in effect since 1970, but when the agreement was revised in 1977 no change was made in the clause. Curtis was equally responsible for the selection and retention of the language and should not now be heard to complain of its insufficiency for its intended purpose.

The record in *Hallmark*, shows that no request was ever made in the trial court or on appeal for prospective enforcement of the non-competition clause. When the case was argued, the court was confronted only with a prayer for an injunction "for a period of 18 months from the date of her termination," a period then ended. Here RESCO, as soon as it could address this court after an appeal had been granted, requested prospective enforcement.

■ Curtis argues that prospective enforcement would rewrite the parties' contract, creating a protected period upon which they had not agreed. This misstates the issue. Curtis was obligated to refrain from competition for a period of three years from termination. The question before the court is whether he is able, by his breach of his agreement, not only to reap the profits of his breach but also to render the judicial system impotent to redress it, simply by forcing the other party to go through lengthy litigation to obtain relief. We answer this in the negative.

The great historic strength of equity in our system of justice is its flexibility.

> In the administration of remedies, an equity court is not bound by the strict rules of the common law, but adapts its relief and molds its decrees to satisfy the requirements of the case. Its purpose is the accomplishment of justice, and it will administer such relief as the exigencies of the case demand. The absence of precedents, or novelty in incident, presents no obstacle to the exercise of its jurisdiction. [Citations omitted.]
>
> "Equitable remedies . . . are distinguished by their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application; the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties."

*First Nat. Bank* v. *Hughson*, 194 Va. 736, 752-54, 74 S.E.2d 797, 809 (1953), Buchanan, J., concurring.

■ Although we find no precedent for prospective enforcement of such a covenant in Virginia, other courts have granted such relief in similar circumstances. *See, e.g., Capelouto* v. *Orkin Exterminating Co.,* 183 So.2d 532 (Fla. 1966); *Fullerton Lumber Co.* v. *Torborg,* 70 N.W.2d 585 (Wis. 1955). We think that such a remedy is proper in this case.

The decree will be reversed and the cause remanded to the circuit court for the entry of a decree enjoining the appellee from violating the non-competition provisions of the employment contract for a period of two and one-half years (30 months) from the date of entry of the decree.

*Reversed and remanded.*

CARRICO, C.J., dissenting

I would give *Hallmark* v. *Jones,* 207 Va. 968, 154 S.E.2d 5 (1967), full stare decisis effect and hold moot the issues in this case. No one laments more than I the delay in disposition of appeals caused by the congested condition of our docket, but I do not believe this unhappy state of affairs converts itself into authority to make a new and different contract for the parties.